JAMES G. HOOVER AND EDNA HOOVER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

CHARLES A. HOOVER AND DELLA HOOVER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 68417, 68418. Filed June 11, 1959.

*John A. Ross, Esq.*, for the petitioners.
*Drew R. Tillotson, Esq.*, for the respondent.

MULRONEY, *Judge:* Respondent determined deficiencies in the petitioners' income tax as follows:

| Docket No. | Name | Year | Deficiency |
|---|---|---|---|
| 68417 | James G. and Edna Hoover | 1953 | $10, 291. 40 |
| | | 1954 | 11, 149. 00 |
| | | 1955 | 16, 414. 93 |
| 68418 | Charles A. and Della Hoover | 1953 | 2, 021. 94 |
| | | 1954 | 458. 28 |
| | | 1955 | 327. 05 |

In an amendment to the answer the respondent claimed additional deficiencies in the petitioners' income tax as follows:

| Docket No. | Year | Additional deficiency |
|---|---|---|
| 68417 | 1953 | $2, 266. 84 |
| | 1955 | 5, 711. 69 |
| 68418 | 1953 | 1, 736. 92 |
| | 1955 | 71. 85 |

The issues in these consolidated cases are:

(1) Whether the gains realized from the sales of real estate in the years 1953, 1954, and 1955, including installment payments on real property sold in prior years, are taxable as long-term capital gains or as ordinary income;

(2) Whether the petitioners in Docket No. 68417 are entitled to a long-term capital loss deduction in 1953 due to worthlessness of stock in a community development corporation; and

(3) Whether certain payments made by the petitioners in the years 1953 and 1955 to an employee of the Land Trust of Jackson County, Missouri, are properly deductible as expenses in the sale of properties acquired from said Land Trust.

### FINDINGS OF FACT.

Some of the facts have been stipulated and they are found accordingly.

James G. and Edna Hoover, husband and wife, and Charles A. and Della Hoover, husband and wife, are residents of Kansas City, Missouri. James G. and Edna Hoover, and Charles A. and Della Hoover, filed timely joint income tax returns with the district director of internal revenue, Kansas City, Missouri, for the taxable years 1953, 1954, and 1955.

The Hoover Brothers Construction Company, hereinafter called the partnership or Hoover Brothers, is an equal partnership consisting of James G. and Charles A. Hoover. This partnership of the two Hoover brothers, which had existed since prior to 1913, was engaged in the construction business. Charles became inactive in the partnership when he was blinded in a mine accident sometime around 1940 and thereafter James conducted all of the business of the partnership.

James' main business, in which he had been engaged for 40 years, was the contracting business, but he was active in the management and operation of many other companies or corporations in which he owned a substantial interest, ranging from 25 per cent to 100 per cent. During the years in question he was active in managing some 12 or 13 such companies engaged in construction business, paving business, asphalt business, crushed rock business, ready-mixed concrete business, electrical business, sanitation business, livestock business, gasoline business, equipment business, and miscellaneous other businesses. The total gross income of all of these businesses in which James was active in operating and interested as owner, including Hoover Brothers, was between 2 and 3 million dollars in each of the years in question.

In addition to the above enterprises, James was the director of three banks. He owned the majority of the stock of the Concordia Bank of Concordia, Missouri. He was the largest single stockholder

(about 40 per cent) in the Southeast State Bank of Kansas City, Missouri, and he was a director of the Mercantile Bank and Trust Company of Kansas City, Missouri.

Beginning as early as 1913, James followed a policy of buying for the partnership pieces of real estate, mostly in and around Jackson County, Missouri, and Kansas City, and generally the property consisted of scattered parcels of vacant property, with some industrial property, a few farms, and a few residences. Some of the property was acquired from estates, some at mortgage foreclosures, some at land auctions, some at sheriffs' sales, and some at sales of tax-delinquent land. Generally, the property was not improved and it would be held for a long period of time (sometimes as long as 20 years) and then sold. Sometimes realty in the partnership would be turned over to James at book value and he would sell it. Occasionally the parcels would be temporarily used by Hoover Brothers or some of James' business enterprises or for the storage of construction machinery and equipment.

During the years 1945 through 1955, Hoover Brothers acquired 46 pieces of vacant property, about a third of which cost less than $1,000 each; 15 farms, 10 of which cost less than $6,000 each; 5 residences at a cost ranging from a low of $6,574.69 to a high of $13,612.64; and 2 buildings, 1 costing $3,058.80 and the other $15,574.23.

James owned no real estate in the years 1949, 1950, and 1951. In 1952 he acquired 2 houses at a total cost of $16,801.62. He acquired no property in 1953 and on January 1, 1954, Hoover Brothers transferred to James the following real properties:

| Type of property | Number of parcels | Cost |
|---|---|---|
| Buildings | 3 | $47,827.42 |
| Houses | 2 | 14,938.74 |
| Vacant | 26 | 48,742.46 |
| Farms | 11 | 113,513.28 |
| | 42 | 225,021.90 |

During the years 1954 through 1957 James G. Hoover acquired the following property:

| Type of property | Year acquired | Cost | Type of property | Year acquired | Cost |
|---|---|---|---|---|---|
| Vacant | 1954 | $3,000.00 | Vacant | 1957 | $450.00 |
| Vacant | 1954 | 3.35 | Vacant | 1957 | 225.00 |
| Residence | 1955 | 7,164.28 | Vacant | 1957 | 1,150.10 |
| Vacant | 1956 | 3,243.40 | Residence | 1957 | 12,210.29 |
| Vacant | 1956 | 523.32 | | | |
| Residence | 1956 | 1,251.60 | | | 29,221.34 |

During the years 1945 through 1955 Hoover Brothers made the following sales of real property:

## NOT DEPRECIATED

| Length of time parcel held | | Date sold | Cost | Profit (or loss) |
|---|---|---|---|---|
| Year | Month | | | |
| 1 | 1 | April 1946 | $917.42 | $2,281.90 |
| 0 | 5 | May 1947 | 378.28 | 271.72 |
| 0 | 0 | July 1947 | 3,790.76 | 446.99 |
| 10 | ---- | September 1948 | 225.15 | 337.08 |
| 7 | ---- | July 1948 | 250.00 | 241.95 |
| 2 | ---- | March 1948 | 1,475.17 | 3,510.83 |
| 2 | ---- | October 1948 | 137.50 | 162.50 |
| 3 | ---- | 1949 | 131.27 | 43.73 |
| 0 | 7 | October 1949 | 19,135.87 | 5,864.13 |
| 5 | 3 | December 1950 | 9,213.63 | 11,986.37 |
| 0 | 5 | September 1950 | 6,781.84 | 2,118.16 |
| 4 | 7 | May 1951 | 224.86 | 225.14 |
| 0 | 9 | January 1951 | 2,958.70 | 1,041.30 |
| 1 | ---- | August 1951 | 6,814.92 | 685.08 |
| 0 | 0 | February 1951 | 16,000.00 | 1,498.35 |
| 1 | ---- | December 1952 | 27,275.96 | ---------- |
| 39 | 0 | May 1952 | 1,706.54 | 2,293.46 |
| 20 | 6 | December 1952 | 831.33 | (831.33) |
| 6 | 0 | October 1952 | 524.39 | 975.61 |
| 5 | 11 | September 1952 | 674.15 | 825.85 |
| 5 | 6 | April 1952 | 323.10 | 326.90 |
| 5 | 3 | January 1952 | 249.70 | 450.30 |
| 5 | 6 | December 1952 | 1,616.70 | ---------- |
| 1 | 8 | August 1952 | 2,417.55 | 5,582.45 |
| 2 | 5 | January 1952 | 2,624.38 | 1,125.62 |
| 6 | 2 | February 1953 | 3,061.20 | 6,857.10 |
| 0 | 2 | April 1953 | 250.00 | 375.55 |
| 2 | 5 | January 1953 | 3,188.40 | 5,737.23 |
| 3 | 0 | April 1953 | 608.83 | 290.07 |
| 5 | 8 | March 1953 | 556.45 | 1,015.29 |
| 2 | 11 | May 1953 | 6,464.36 | 2,285.64 |
| 7 | 7 | May 1954 | 701.50 | 798.50 |
| 2 | 0 | October 1954 | 8,430.81 | 4,069.19 |
| 3 | 6 | July 1955 | 1,201.70 | 117.75 |
| 6 | 11 | July 1955 | 2,310.70 | 1,817.93 |
| 8 | 3 | January 1955 | ---------- | 877.30 |
| | | | | 65,705.64 |

## DEPRECIABLE

| | | | | |
|---|---|---|---|---|
| 12 | 4 | March 1945 | $4,183.49 | $4,656.51 |
| 7 | 6 | August 1945 | 761.80 | 3,325.99 |
| 13 | 8 | September 1945 | 10,700.00 | 4,285.55 |
| 13 | 2 | March 1945 | 3,250.98 | 3,712.57 |
| 7 | 3 | February 1945 | 4,245.19 | 2,260.27 |
| 4 | 3 | March 1945 | 2,540.40 | 4,445.69 |
| 8 | 3 | July 1945 | 5,174.73 | 6,407.86 |
| 13 | 3 | April 1945 | 3,368.45 | 3,356.35 |
| 13 | 1 | February 1945 | 2,692.70 | 3,800.95 |
| 13 | 5 | April 1946 | 4,133.98 | 6,006.68 |
| 8 | 0 | February 1946 | 2,387.90 | 6,700.39 |
| 8 | 5 | June 1946 | 1,870.48 | 2,438.29 |
| 5 | 6 | April 1946 | 2,045.01 | 4,185.87 |
| 5 | 4 | April 1946 | 2,045.92 | 3,439.33 |
| 13 | 5 | April 1946 | 4,343.69 | 4,303.62 |
| 10 | ---- | September 1947 | 10,996.67 | 7,264.89 |
| 11 | ---- | December 1948 | 4,223.47 | 7,276.53 |
| 15 | ---- | November 1948 | 15,609.88 | 11,220.61 |
| 10 | ---- | 1949 | 1,760.41 | 3,939.59 |
| 17 | ---- | 1949 | 4,272.29 | 4,754.79 |
| 11 | 8 | February 1950 | 1,304.90 | 2,093.05 |
| 24 | ---- | 1952 | 12,134.65 | 6,365.35 |
| 21 | 3 | April 1953 | 9,201.90 | 6,476.50 |
| | | | | 112,807.23 |

During the years 1953 through 1957 James G. Hoover sold the following parcels of real property:

| Date acquired | Date sold | Selling price | Gain (or loss) |
|---|---|---|---|
| Mar. 10, 1952 [2] | Jan. 2, 1953 | $8,950.00 | $549.16 |
| Oct. 30, 1952 [2] | June 10, 1953 | 11,000.00 | 2,599.19 |
| Jan. 2, 1953 [1] | Aug. 3, 1953 | 62,500.00 | 51,924.98 |
| Feb. 17, 1953 [3] | June 2, 1954 | 4,500.00 | 2,275.16 |
| July 16, 1952 [3] | Dec. 1, 1955 | 1,500.00 | 535.63 |
| July 28, 1950 [2] | Jan. 4, 1955 | 850.00 | 473.44 |
| July 3, 1948 [3] | Jan. 1, 1955 | 17,250.00 | 7,539.25 |
| Oct. 27, 1952 [3] | Oct. 31, 1955 | 11,000.00 | 9,528.10 |
| Jan. 31, 1928 [3] | Sept. 1, 1955 | 4,544.49 | 3,300.00 |
| Jan. 27, 1948 [3] | July 25, 1956 | 18,172.51 | (2,139.08) |
| Jan. 1, 1954 [4] | Sept. 1, 1957 | 1,750.00 | 966.80 |
| Jan. 1, 1954 [5] | Jan. 10, 1957 | 2,252.40 | |
| Jan. 1, 1954 [6] | Apr. 22, 1957 | 15,000.00 | 13,643.75 |
| Jan. 1, 1954 [2] | June 10, 1957 | 2,000.00 | 1,395.81 |
| | | 161,269.40 | 92,592.22 |

[1] Acquired from Federal Construction Company, a corporation controlled by James G. Hoover (99.5 per cent of the stock). Federal Construction Company acquired this property about 1940. The rest of the properties were acquired from Hoover Brothers.
[2] Acquired by Hoover Brothers in 1950.
[3] Acquired by Hoover Brothers in the same year.
[4] Acquired by Hoover Brothers in 1951.
[5] Acquired by Hoover Brothers in 1952.
[6] Acquired by Hoover Brothers in 1949 and 1951.

Most of the properties sold by James G. Hoover and Hoover Brothers during the years 1953, 1954, and 1955 were vacant land and produced no rental income.

Hoover Brothers, on its partnership return filed for the year 1953, reported ordinary net income of $70,148.94 and, in addition, reported from the sale of real property a net short-term capital gain of $409.10 and a net long-term capital gain of $13,754.16.[1] Included in the net capital gains was the amount of $1,641.32 which represented profits realized on sales made in prior years and reported on the installment basis. The ordinary net income included $10,294.08, mostly from equipment rental and rock royalties, $10,182 received as a distribution from another partnership (Hoover & Lewis) engaged in the sale of grain and livestock, $35,508 as dividends, $6,544.46 as interest, $1,919.41 as rents, and $5,700.81 as net profit from the operations of the Junction City Sanitation Agency. In its partnership return filed for the year 1954 Hoover Brothers reported ordinary net income of $29,785.93 and, in addition, reported a net short-term capital gain of $157.49 and a net long-term capital gain of $6,110.49.[2] Included in the net capital gains was the amount of $4,703.65, which represented profits realized on sales made in prior years and reported on the installment basis. The ordinary net income included $17,680.42

[1] In 1953 Hoover Brothers sold a filling station and a farm for a net long-term capital gain of $13,333.60. These two sales were reported on the installment basis. Consequently, only $2,784.61 of the realized gain was reported in 1953.

[2] One of the real property sales, on which a net long-term capital gain of $4,069.19 was realized, was reported on the installment basis. Consequently, only $208.34 of the realized gain was reported in 1954.

from equipment rental, $5,032.07 from the Junction City Sanitation Agency, $1,198.55 from the Hoover & Lewis partnership, $9,124 in dividends, $7,315.95 in interest, and $1,610.05 in rents. In its partnership return filed for the year 1955 Hoover Brothers reported a loss of $883.05 and, in addition, reported a net short-term capital gain of $61.84 and a net long-term capital gain of $5,349.98. Included in the net capital gains was the amount of $2,598.84, which represented profits realized on sales made in prior years and reported on the installment basis.

Charles A. Hoover's only income was his distributable share of the partnership income of Hoover Brothers. The deficiency in his case results from the Commissioner's determination that the gains realized from the partnership's sales of realty in the years 1953, 1954, and 1955 represent ordinary income rather than capital gains as reported. Part of the deficiencies in James' case results from the same determination and part from the Commissioner's determination that the gains realized from James' sales of realty in the years 1953, 1954, and 1955 represent ordinary income rather than capital gains as reported. During the years 1953, 1954, and 1955 James and his wife reported ordinary gross income of $99,073.99, $103,051.16, and $95,558.56, respectively.

None of the properties sold by Hoover Brothers or by James G. Hoover was ever advertised for sale, except for signs on a few parcels owned and sold by James G. Hoover, in early years. James G. Hoover has never held a real estate license. No real estate agents or brokers were ever engaged on a permanent basis to sell property for Hoover Brothers or for James G. Hoover. There were no signs indicating that James G. Hoover or Hoover Brothers was in the real estate business. None of the properties was subdivided by James G. Hoover or by Hoover Brothers. Some of the properties acquired by Hoover Brothers over the years, and later sold, were used in the partnership's activities such as office space or for the purpose of storing some of the partnership's construction equipment, or as rental property. On the properties described as 8600–8618 Highland, acquired by Hoover Brothers in 1950, several houses were constructed, and after these houses were rented for a time, they were sold by James (in 1953), to whom these properties had been transferred in 1952. Sales of real property made by Hoover Brothers and by James during the years 1953, 1954, and 1955 were often made reluctantly and after direct and repeated solicitation by the buyers themselves. Several of the sales made by Hoover Brothers and James in the years 1953, 1954, and 1955 were made to personal friends or business acquaintances of James. One of the properties sold by James in 1955 was to his daughter. A sale of a house made by James in 1953 was to

the former lessee. A sale of a lot made by Hoover Brothers in 1953 was to the president of a bank in which James G. Hoover was a stockholder. Another sale in 1953 made by Hoover Brothers was to James G. Hoover's attorney.

### Concordia Stock Loss Issue.

The Concordia Industrial Development Company was organized to construct a building for a garment factory to be located in Concordia, Missouri. In 1948 James G. Hoover bought 5 shares of stock in this corporation at a cost of $512.50. All the business people in Concordia subscribed to this stock in order to construct the building. The purpose of this building was to induce more industry to come to Concordia. At the time of his purchase, James G. Hoover was a majority stockholder in the Concordia Bank. He still held the 5 shares of stock in the development corporation at the time of the trial. In the joint return filed by James G. Hoover and his wife in 1953, he claimed a loss deduction due to worthless stock in the amount of $512.50. His explanation on the return was that the cost of stock "cannot be recovered." Respondent disallowed this loss deduction.

### Deductibility of Certain Payments Made in 1953 and 1955 to an Employee of the Land Trust.

The Land Trust of Jackson County, Missouri, is a commission created by the laws of the State of Missouri for the management, sale, and other disposition of delinquent lands. During the years 1948 through 1956 Granville Richart, now deceased, was the land commissioner, and as such he was a salaried employee of the Land Trust. Granville Richart was also a real estate broker and sheriff of Jackson County, Missouri. The land commissioner is the administrative and executive officer of the Land Trust and it is his duty to interest prospective purchasers of its real property. He does not have the authority to sell any of the properties but merely accepts bids from prospective purchasers. Authority to sell the properties rests solely with the three trustees of the Land Trust.

During the years 1948 through 1952 James G. Hoover, for himself or on behalf of Hoover Brothers, acquired five parcels of real property from the Land Trust for a total cost of $9,530. These properties were sold by James G. Hoover and/or Hoover Brothers in the years 1953 and 1955 for a total selling price of $40,250. When the properties were sold, payments totaling $12,997.86 were made to Granville Richart.

The payments to Granville Richart were deducted as expenses of sale on the returns filed by James G. Hoover and/or Hoover Brothers for the years 1953 and 1955. By an amendment to his answer the

respondent sought to disallow these deductions with the explanation that they were "not an ordinary and necessary business expense." In a second amendment to his answer, the respondent made the further explanation that such payments "were not ordinary and necessary business expenses since said payments were against public policy and were made in violation of the laws of the State of Missouri."

OPINION.

The first question is whether the gains realized from sales of realty by James and Hoover Brothers in the years 1953, 1954, and 1955 were sales of property held primarily for sale to customers in the ordinary course of trade or business within section 117(a)(1), I.R.C. 1939, and section 1221(1), I.R.C. 1954. It is the position of petitioners that the real property acquired by the partnership and James was acquired for investment purposes and the sales were sales of investments and neither the partnership nor James was in the real estate business.

Several well-recognized tests have been evolved by the courts in the course of deciding whether property at the time of sale is a capital asset held by the taxpayer as an investment or property held primarily for sale to customers in the ordinary course of his trade or business. These tests include the purpose or reason for the taxpayer's acquisition of the property and in disposing of it; the continuity of sales or sales-related activity over a period of time; the number and frequency of sales; the extent to which the taxpayer or his agents have engaged in sales activities by developing or improving the property, soliciting customers, and advertising; and the substantiality of the sales when compared to other sources of taxpayer's income. *Boomhower* v. *United States*, 74 F. Supp. 997; *Martin Dressen*, 17 T.C. 1443; *W. T. Thrift, Sr.*, 15 T.C. 366. However, as this Court pointed out in the *Thrift* case, "No one of these tests can be regarded as determinative but the question must be viewed in the light of all pertinent factors and particularly the facts of the individual case."

We are of the opinion that the partnership and James were engaged solely in investment activities in acquiring and selling the real estate during the years in question. James, who was in sole control of the partnership, testified that he and the partnership had, since as far back as 1913, followed a policy of investing surplus income in purchases of parcels of realty which they would hold for the increase in value that they felt would sooner or later come to pass and the sales were sales of such investments. When we apply the tests which have often been used to decide whether or not taxpayers have been in the real estate business in relation to the sales of realty they have made, we feel the record corroborates the testimony of James.

There was no practice of advertising the parcels of realty for sale, no listing of property for sale with any real estate dealers, and, except for a few instances in early years, no signs were placed on the property advertising it for sale, and there was no sign at the office of James or the partnership indicating they were engaged in the real estate business or held parcels of realty for sale. Such advertising would be a normal activity if petitioners were engaged in the real estate business. Indeed, it would seem to be a necessary activity for a real estate business under the facts here, where prospective customers would not be expected to know the ownership of such scattered parcels as petitioners owned. It may be true that lack of advertising is not significant when lots in a development that is well known and identified in a community are the parcels to be sold. We think it is quite significant when the parcels are widely scattered.

The general policy seemed to be to erect no improvements on the parcels. If improvements were made they were generally for the benefit of the partnership or James or one of their affiliated companies. The only other improvements were the erection of a few houses on land which had already been subdivided and on which all utilities had been made available.

The parcels of real property acquired over the years by the partnership and by James were preponderately vacant land, with a few farms and some few residences. None of the property was ever subdivided. There was one piece of property sold by James in 1953 that was ideal for subdivision and in fact acquired by the purchaser for such purpose. This was the 62-acre Sni-A-Bar Farm that James acquired from his wholly owned corporation, the Federal Construction Company. Had James wanted to enter the real estate business by subdivision and development of his land, the opportunity was present. We have, when holding a taxpayer was in the real estate business, noted his rejection of an offer to buy an entire tract that is suitable for lot development. *George W. Longfellow*, 31 T.C. 11. James' acceptance of a subdivider's offer to purchase the entire tract is consistent with his investment claim.

No real estate agents or brokers were asked to carry on a program of selling these properties. There was no solicitation of prospective buyers. In fact James was careful to introduce testimony of purchasers of several of the properties in the years 1953 through 1955 to emphasize the reluctance shown by him and by the partnership to sell some of the properties. Also, there is a pattern of sales in these 3 years to personal friends of James. One of the properties was sold to James' daughter, one to his attorney, and another to a bank official of a bank in which James was an important stockholder.

Approaches of prospective buyers were, for the most part, unsolicited.

Indicative of the fact that petitioners were not in the real estate business is the impressively long periods of time that some of the property was held. In determining the length of time property sold by James was held, we deem it right to add the time the partnership or James' wholly owned corporation held it before it was transferred to him. If we examine the 9 parcels of real property sold in the years 1953, 1954, and 1955 by James, individually, we see that the holding periods range from approximately a year and a half up to 27½ years. Five of the parcels were held for 3 years or more. If we examine the 12 parcels of real property sold by the partnership during these same years, we find that 6 of the properties were held for approximately 6 years or more, and that one of these was held for more than 21 years. Even if we look at the properties sold by the partnership and by James in the years preceding and following the years 1953, 1954, and 1955, we see the same pattern.

Respondent stresses the frequency and continuity of sales. He makes much of the fact that James and Hoover Brothers together sold 73 parcels of real estate of varying types over the years 1945 through 1957. An analysis of the 59 parcels of property sold by the partnership during this 12-year period reveals that 23 of them were depreciable properties with many of them rented or used in some way by the partnership in its various enterprises. Again, these properties sold by the partnership and by James were, as we have pointed out above, held for long periods of time, ranging from a few years to as high as 39 years, which is certainly consistent with the investment argument. In *Frieda E. J. Farley*, 7 T.C. 198, where the respondent also rested primarily upon the facts that the sales were frequent and consistent, this Court pointed out "that the cases which have applied this test to real estate transactions involved elements of development and substantial sales activity which are essentially lacking in the instant case." This comment is particularly appropriate here.

Respondent argues the record shows much time spent in acquiring and selling realty. We think the record discloses not much more than normal time that would be devoted in most any case to supervision of investments. It took some time to select the parcels for purchase but once bought the general policy seemed to be to do nothing with the parcels until some prospective purchaser made inquiry. The highest number of sales ever concluded in any one year was 11 in 1952 and in most years the sales would hardly average more than 3 or 4.

About the strongest factor supporting petitioners is the relation of petitioners' other income to the gains derived from the sales of

realty. Generally, during the years in question the income of James and the partnership from normal business activities far exceeded income from sales of realty. James' personal income during the 3 years never dropped below $95,000 and went up in 1954 in excess of $100,000. The capital gains reported by James for these 3 years were $10,240.62 in 1953, $8,234.93 in 1954, and $20,183.93 in 1955.

The record shows neither the partnership nor James was a buyer of commercial stocks or bonds. They did own some stocks but they were mostly in banks or companies that the partnership or James were interested in or actively managed. It is readily apparent both the partnership and James would have excess income for investment purposes and this supports James' testimony of real estate investments. Respondent makes mention of the fact that so much of the real estate was vacant, and, therefore, it could not be expected to produce investment income. We feel this rather supports petitioners. It is understandable that petitioners, in a high income tax bracket, might well seek investments of the nature of the so-called "growth" investments. Buying non-income-producing realty to hold for expected rise in value is much like investments in the stock market where stock is purchased purely as an investment, not upon the theory that it will produce immediate income, but that it has growth value.

We hold that, on the basis of the entire record, the properties sold by Hoover Brothers and by James in the years 1953, 1954, and 1955 were not held primarily for sale to customers in the ordinary course of a trade or business. We sustain the petitioners on this issue.

We feel that this holding also results in sustaining petitioners with respect to the installment payments on real property sold in prior years. These payments were received during the years 1953, 1954, and 1955. We have held petitioners were not in the real estate business during those years. Their purchases and sales of realty during earlier years followed the same pattern, which we have held to be investment activity, rather than a trade or business. On these facts we sustain petitioners on the issue.

James and Hoover Brothers acquired many parcels of realty from the Land Trust of Jackson County. This is a commission created by the statutes of Missouri for the management, sale, and other disposition of tax delinquent lands. During the years 1948 through 1956 Granville Richart, now deceased, was the land commissioner. As land commissioner he was the administrative and executive officer of the Land Trust, with duties to familiarize himself with land trust properties and discuss such properties with prospective buyers. He was not authorized to sell the properties as such authority to sell rested in the three trustees of the Land Trust. However, he was a paid employee of the trust and he was also county sheriff and he was a licensed real estate operator.

In the years 1953 and 1955 Hoover Brothers and James sold five parcels of realty, which had been originally acquired by purchase from the Land Trust, for a total cost of $9,530. The five parcels were sold for a total price of $40,250 and in each instance a sum was deducted by Hoover Brothers as selling expense for a payment made to Granville Richart. The total of the sums so paid was $12,997.86. By an amendment to his answer, respondent sought to disallow the above deductions on the ground that the payments made to Granville Richart were in violation of the laws of the State of Missouri and, therefore, cannot constitute ordinary and necessary expenses.

Respondent had the burden of proof on this issue. The payments that were made to Richart are admitted but it is by no means clear that such payments were in violation of any law of Missouri. Respondent cites section 141.810, Mo. Ann. Stat. (Vernon), providing as follows:

141.810. Compensation of employees, limitations—penalty for violation (class one counties)

1. Neither said trustees nor any salaried employee of the land trust, provided for herein, shall receive any compensation, emolument or other profit directly or indirectly from the rental, management, purchase, sale or other disposition of any lands held by such land trust other than the salaries, expenses and emoluments provided for herein.

2. Any person convicted of violating this section shall be deemed guilty of a felony and upon conviction thereof shall be sentenced to serve not less than two nor more than five years in the state penitentiary. (L.1943 p. 1029 § 46)

The statute prohibits the receipt of compensation by a salaried employee from the sale or other disposition of the property. Whether this means compensation on a sale by the trust or is intended to bar compensation in a later sale by the purchaser from the trust, we do not know. The statute has never been construed by the Missouri courts, so far as we can learn, and we are told on brief that there never has been a prosecution for violation of this statute. It certainly is not clear that any money received by a salaried employee who is also a licensed real estate operator in a sale transaction in which the Land Trust was not a party, results in a violation of the law. Nor can it be merely implied, from the fact that such payments were made, there was some illegal arrangement at the time the trust sold the property for Richart's sharing in the profits from the later sale.

Respondent's whole argument rests on his mere assumption that the payments to Richart were in violation of the quoted statute. He argues on brief that the evidence "establishes an arrangement between Hoover and Richart whereby Richart would advise Hoover as to desirable properties held by the Land Trust in return for a substantial portion of the gain on the subsequent sale of the property

by Hoover." This is definitely not established by the evidence. The only direct evidence we have on the point is the testimony of James that no such arrangement existed. Respondent merely assumes the arrangement existed from the fact of payments to Richart plus the fact that James Hoover, who bought many parcels from the Land Trust, was friendly with Richart and frequently seen in private conferences with him. Respondent's argument is largely devoted to a discussion of petitioners' evidence explaining the deductions which respondent brands as "unworthy of belief." Respondent cannot prevail on this issue because of the weakness of petitioners' evidence—which was generally to the effect that the payments were compensation for Richart sending buyers to James. The only argument advanced for disallowance of the payments as deductions is that they were made in violation of law. Respondent's failure to establish that fact means petitioners prevail on this issue.

The Concordia Industrial Development Company was organized to construct a building for a garment factory in Concordia, Missouri. The purpose of this was to induce industry to come to Concordia. James, as a majority stockholder in the Concordia Bank, joined the other members of this community in subscribing to the development company stock and he purchased 5 shares at a cost of $512.50 in 1948. In 1953 he claimed a loss deduction for the 5 shares of stock, explaining on his return that the cost of such stock could not be recovered. Respondent disallowed the deduction. James argues the loss was deductible under section 23(g) of the Internal Revenue Code of 1939, which allows a capital loss deduction in the year in which shares of stock in a corporation become worthless.

A loss may be deducted only in the year in which it is sustained. There must be something identifiable to mark the period. *United States* v. *White Dental Co.*, 274 U.S. 398. All we have in the present case is the bare statement of James that the stock could not be recovered in 1953, and nothing else. This is not enough to establish the loss. As the United States Supreme Court pointed out in *Boehm* v. *Commissioner*, 326 U.S. 287, "a determination of whether a loss was in fact sustained in a particular year cannot fairly be made by confining the trier of facts to an examination of the taxpayer's beliefs and actions." All pertinent facts and circumstances must be open to our inspection, and yet none of them has been brought to our attention. At the very least, James must show that the stock had value at the beginning of 1953, and that it lost such value during the year. *Julian M. Livingston*, 46 B.T.A. 538. James has not done this and, in fact, we find it extremely difficult to understand how this stock could ever have any value. The development company did not purport to carry on any business enterprise which would give the stock

any value, even from the moment it was purchased by James in 1948. We fail to see how James singled out the year 1953 in which to say that this stock was worthless. On the basis of the record before us, we hold that James has failed to carry his burden of proof on this issue.

*Decisions will be entered under Rule 50.*