Herman Katz and Gertrude Katz v. Commissioner.
Katz v. Commissioner
Docket No. 65663.
United States Tax Court
T.C. Memo 1960-200; 1960 Tax Ct. Memo LEXIS 89; 19 T.C.M. (CCH) 1035; T.C.M. (RIA) 60200; September 28, 1960
Howard L. Kuttner, Esq., 165 Broadway, New York, N. Y., for the petitioners. John A. Dunkel, Esq., and Jules W. Breslow, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: The respondent determined deficiencies in the petitioners' income tax and additions to tax, for the years and in the amounts, as follows: Additions to Tax
Sec.
Sec.
Taxable
294(d)
294(d)
Sec. 294
Year
Deficiency
(1)(A)
(1)(B)
(d)(2)
1951
$1,764.86
$205.59
1952
1,031.40
$165.75
$110.50
1953
3,169.68 There are two issues for decision. The first is whether the statutory notice of deficiency was a valid notice. The second is whether the gain realized by petitioner Herman Katz *90 on the sale of stock in eight corporations is capital gain or ordinary income. Findings of Fact Some of the facts have been stipulated and are so found. Herman Katz and Gertrude Katz are individuals, husband and wife during all of the years here in issue, residing at 3515 Henry Hudson Parkway, Bronx 63, New York. They filed joint returns for all years here in issue; the returns for the taxable years 1951 and 1952 were filed with the district director, Albany, New York, and the return for the taxable year 1953 was filed with the district director, Brooklyn, New York. Gertrude Katz is a party to this proceeding solely by virtue of having joined in a joint return with her husband. Hereafter, Herman Katz will be referred to as the petitioner. In a notice of deficiency dated November 2, 1956, the respondent determined deficiencies in income tax for the taxable years 1950, 1951, 1952 and 1953, and additions to tax for some of those years. The deficiency in income tax determined for the taxable year 1950 is not in dispute. The deficiencies in income tax for the taxable years 1951, 1952 and 1953 determined by respondent were predicated on several adjustments. Only the adjustment *91 relating to the characterization of the gain realized on the sale by petitioner of stock in eight corporations (hereinafter referred to as the eight corporations) is in dispute. The respondent adjusted the petitioner's income by including therein the full amount of gain realized by him on the sale of stock in the eight corporations stating in his notice of deficiency as to each of the three taxable years: It has been determined that you realized additional taxable income in the amount shown from the sale of various luncheonettes and/or stock in corporations which constructed luncheonettes for sale and not capital gain income from such sources. Petitioner, during the years 1951, 1952 and 1953, was a shareholder, officer and director of the Pierre French Ice Cream Company. Jacob Barasch, a stockholder in each of the eight corporations, first met petitioner in 1945 or 1946. The circumstance of their meeting was that Barasch was constructing a luncheonette and cigar store and petitioner sought out Barasch to effect a sale of ice cream to him for use in the store. Barasch had been engaged in the construction and operation of retail cigar and luncheonette stores for many years prior *92 to his meeting petitioner. Alexander Langer, the third stockholder in each of the eight corporations, was in the store fixture business. He first met Barasch when called in by him to estimate the cost of remodeling a store Barasch operated in the Bronx. The association of petitioner, Barasch, and Langer came about through the initial efforts of Langer. Langer first mentioned to Barasch that he had a luncheonette location on Long Island, New York, and that he was willing to take Barasch in on the proposition. After inspecting the location, Barasch agreed to go in with Langer. Petitioner, acquainted with Barasch, was informed of the proposition and was also taken in on it. Petitioner, Barasch, and Langer are sometimes hereinafter referred to as the associates. The associates organized 1275 Burke Avenue Corporation (hereinafter sometimes referred to as Burke Avenue) with a capitalization of three shares of stock which shares were issued, one to each of them, on June 19, 1950. Burke Avenue was the first of the eight corporations. Petitioner invested in the corporation to secure a lease to construct a luncheonette. Prior to the time that the corporation executed a lease, petitioner *93 investigated a proposed site and gave his opinion to Barasch and Langer concerning the advisability of taking a lease on that site for the construction of a luncheonette. At the time the lease was signed, the building in which the corporation took the lease was not yet completed. Upon completion of the building and upon receiving a certificate of occupancy, the corporation engaged the Bronx Soda Fountain Company (sometimes referred to as the Bronx Soda Fountain Company or the fixture company) to construct luncheonette fixtures on the site. Before the construction of the fixtures was completed, the associates entered into a contract for the sale of their stock in this corporation. Plans for the store, drawn by the fixture company, were shown to the associates and then to the prospective purchaser. Certain changes and modifications were made in these plans at the request of the purchaser. The cost of the installed fixtures was approximately $12,500 and the construction of these fixtures took approximately three months. Finally, on April 30, 1951, each of the associates transferred his one share of stock in Burke Avenue to the purchaser for an aggregate consideration of $18,475. Their *94 aggregate basis for the stock was $10,784 and their gain on the sale was $7,691 of which $2,563.67 was distributed to petitioner. Burke Avenue never engaged in the operation of a luncheonette during the period of time its stock was held by the associates. The associates organized Terrace Luncheonette, Incorporated (hereinafter sometimes referred to as Terrace) with a capitalization of three shares of stock which shares were issued, one to each of them, on June 19, 1950. Terrace was the second of the eight corporations. Terrace secured two separate leaseholds. The first, at Bell Boulevard and 73rd Street, Bayside, Queens, was taken from the plans of the building. The second, on Middleneck Road in Great Neck, New York, was taken at a time when the building was under construction. In respect of the luncheonette at Bell Boulevard and 73rd Street, the corporation engaged the Bronx Soda Fountain Company to construct luncheonette fixtures on the site. The cost of these fixtures was approximately $17,000 or $18,000. Terrace operated a luncheonette at the Bell Boulevard site for approximately one month. During the period of operation, inquiry was made to Barasch and Langer about the corporation's *95 sale or assignment of the lease it owned at Middleneck Road. To effect a transfer of this leasehold, Alba Luncheonette, Incorporated, was organized and the lease transferred to it. On April 28, 1951, the associates entered into a contract for the sale of their stock in Terrace and on May 5, 1951, each associate transferred his one share of stock to the purchaser for an aggregate consideration of $49,488.81. Their aggregate basis for the stock was $34,286 and their gain on the sale was $15,162.81 of which $5,054.27 was distributed to petitioner. Terrace, during the period of time its stock was held by the associates, operated a luncheonette for approximately one month. The associates organized Willets Point Luncheonette, Incorporated (hereinafter sometimes referred to as Willets Point) with a capitalization of three shares of stock which shares were issued, one to each of them, on January 24, 1951. Willets Point was the third of the eight corporations. Willets Point entered into a lease on a store on the basis of blueprints of a building then under construction. Upon the completion of the building, the corporation engaged the Bronx Soda Fountain Company to construct luncheonette fixtures *96 on the site. Before the construction of the fixtures was completed, the associates entered into a contract for the sale of their stock in Willets Point. A deposit was given by the purchaser and the payment of the balance due on the purchase price was conditioned upon completion of the construction. Plans for the store, drawn by the fixture company, were shown to the associates and to the purchaser before the contract for the sale of the stock was executed. Certain changes and modifications were made in these plans at the request of the purchaser. The cost of the installed fixtures was approximately $13,000. On September 30, 1952, each of the associates transferred his one share of stock in Willets Point to the purchaser for an aggregate consideration of $24,100. In connection with the sale of the stock, the associates executed a covenant in favor of the purchaser agreeing that they would not become associated with a competing business located within a described area. Their aggregate basis for the stock was $17,002 and their gain on the sale was $7,098 of which $2,366 was distributed to petitioner. Willets Point never engaged in the operation of a luncheonette during the period of time *97 its stock was held by the associates. The associates organized Utopia Luncheonette, Incorporated (hereinafter sometimes referred to as Utopia) with a capitalization of three shares of stock which shares were issued, one to each of them, on March 15, 1951. Utopia was not one of the eight corporations. After engaging the Bronx Soda Fountain Company to construct a luncheonette, Utopia sold the Luncheonette business and later in 1952 the shareholders caused the liquidation of Utopia receiving a net gain upon liquidation of $169.53 of which $56.51 was distributed to petitioner. The associates or Terrace organized Alba Luncheonette, Incorporated (hereinafter sometimes referred to as Alba) with a capitalization of three shares of stock which shares were issued, one to each of them, on May 11, 1951. Alba was the fourth of the eight corporations. The lease held by Terrace on the Middleneck Road store was transferred to Alba which then engaged the Bronx Soda Fountain Company to construct luncheonette fixtures on the site. Before the construction of the fixtures was completed, the associates entered into a contract for the sale of their stock in Alba. A deposit was given by the purchaser *98 and the payment of the balance due on the purchase price of the stock was conditioned upon completion of the construction. Plans for the store, drawn by the fixture company, were shown to the associates and to the purchaser. Certain changes and modifications were made in these plans at the request of the purchaser who stated his requirements as to the fixtures. The cost of the installed fixtures was approximately $13,500. On August 27, 1951, each of the associates transferred his one share of stock in Alba to the purchaser for an aggregate consideration of $17,466.70. In connection with the sale of the stock, the associates executed a restrictive covenant. Their aggregate basis for the stock was $9,254 and their gain on the sale was $8,212.70 of which $2,737.57 was distributed to petitioner. Alba never engaged in the operation of a luncheonette during the period of time its stock was held by the associates. Petitioner, Barasch and Langer, in July of 1951, formed a partnership known as Columbus Avenue Store. The partnership business was sold in August 1951 for $10,000. The partners had a total investment of $4,700 in the partnership, accordingly, they realized a gain of $5,300 of *99 which $1,766.67 was distributed to petitioner. The associates organized Clearview Luncheonette, Incorporated (hereinafter sometimes referred to as Clearview) with a capitalization of three shares of stock which shares were issued, one to each of them, on September 28, 1951. Clearview was the fifth of the eight corporations. Clearview entered into a lease on a store located at 2136 Utopia Parkway, Queens, New York, on the basis of blueprints of a building then under construction. Upon the completion of the building, Clearview engaged the Bronx Soda Fountain Company to construct luncheonette fixtures on the site. Before the construction of the fixtures was completed, the associates entered into a contract for the sale of their stock in Clearview. A deposit was given by the purchaser and the payment of the balance due on the purchase price was conditioned upon completion of the construction. Plans for the store, drawn by the fixture company, were shown to the associates and to the purchaser before the contract for the sale of the stock was executed. Certain changes and modifications were made in these plans at the request of the purchaser who stated his requirements as to the fixtures. *100 The cost of the installed fixtures was approximately $13,000. On April 15, 1952, each of the associates transferred his one share of stock in Clearview to the purchaser for an aggregate consideration of $26,612.50. In connection with the sale of the stock, the associates executed a restrictive covenant. Their aggregate basis for the stock was $17,598.94 and their gain on the sale was $9,013.56 of which $3,004.52 was distributed to petitioner. Clearview never engaged in the operation of a luncheonette during the period of time its stock was held by the associates. The associates organized Hicksville Luncheonette Incorporated (hereinafter sometimes referred to as Hicksville) with a capitalization of three shares of stock which shares were issued, one to each of them, onmarch 4, 1952. Hicksville was the sixth of the eight corporations. Hicksville entered into a lease on a store located on Hicksville Road, Hicksville, Long Island, on the basis of a blueprint of a building then under construction. Upon the completion of the building, Hicksville engaged the Bronx Soda Fountain Company to construct luncheonette fixtures on the site. Before the construction of the fixtures was completed, *101 the associates entered into a contract for the sale of their stock in Hicksville. A deposit was given by the purchaser and the payment of the balance due on the purchase price was conditioned upon completion of the construction. Plans for the store, drawn by the fixture company, were shown to the associates and to the purchaser before the contract for the sale of the stock was executed. Certain changes and modifications were made in these plans at the request of the purchaser who stated his requirements as to the fixtures. The cost of the installed fixtures was approximately $13,500. On May 5, 1953, each of the associates transferred his one share of stock in Hicksville to the purchaser for an aggregate consideration of $27,975. In connection with the sale of the stock, the associates executed a covenant which provided that they would not engage or become interested in a luncheonette or similar business within a radius of five blocks in each direction from the location of the Hicksville store for a term of five years. Their aggregate basis for the stock was $18,068.34, and their gain on the sale was $9,906.66 of which $3,302.22 was distributed to petitioner. Hicksville never engaged *102 in the operation of a luncheonette during the period of time its stock was held by the associates. The associates organized Pomonok Luncheonette, Incorporated (hereinafter sometimes referred to as Pomonok) and each received one-third of the stock which was issued on June 24, 1952. Pomonok was not one of the eight corporations. Each associate sold 50 percent of the stock he had received in a transaction in which three new parties acquired an interest in this corporation. Pomonok operated a luncheonette for several years and petitioner held part of its stock for approximately two years. On April 13, 1954, the associates sold the stock which they then had in Pomonok realizing therefrom a gain of $6,954 of which $2,318 was distributed to petitioner. The associates organized Deepdale Luncheonette, Incorporated (hereinafter sometimes referred to as Deepdale) on July 8, 1952, distributing the stock in equal amounts to each of them. Deepdale was not one of the eight corporations. Each associate sold his stock in this corporation on June 10, 1954, the associates together realizing therefrom a gain of $21,150 of which $7,050 was distributed to petitioner. Deepdale never engaged in the operation *103 of a luncheonette during the period of time its stock was held by the associates. The associates organized Beech Hill Luncheonette, Incorporated (hereinafter sometimes referred to as Beach Hill) on July 9, 1952, distributing the stock in equal amounts to each of them. Beech Hill was not one of the eight corporations. Each associate sold his stock in this corporation on August 4, 1954, the associates realizing therefrom a gain of $9,000 of which $3,000 was distributed to petitioner. Beech Hill never engaged in the operation of a luncheonette during the period of time its stock was held by the associates. The associates organized Will-Jay Luncheonette, Incorporated (hereinafter sometimes referred to as Will-Jay) with a capitalization of three shares of stock which shares were issued, one to each of them, on December 18, 1952. Will-Jay was the seventh of the eight corporations. Will-Jay entered into a lease on a store at Willoughby and Jay Streets, Brooklyn, New York, on the basis of blueprints of a building then under construction. Upon completion of the building, Will-Jay engaged the Bronx Soda Fountain Company to construct luncheonette fixtures on the site. Before the construction *104 of the fixtures was completed, the associates entered into a contract for the sale of their stock in Will-Jay. A deposit was given by the purchaser and the payment of the balance due on the purchase price was conditioned upon completion of the construction. Plans for the store were drawn by the fixture company after the contract for the sale of stock was executed. These plans, accordingly, were drawn to suit the purchaser who stated his requirements as to the fixtures. The cost of the installed fixtures was approximately $13,000. On June 18, 1953, each of the associates transferred his one share of stock in Will-Jay to the purchaser for an aggregate consideration of $41,162.89. In connection with the sale, the associates executed a restricted covenant in which they agreed that they would not engage in or become interested in a luncheonette or similar business within a radius of three blocks in each direction from the address of Will-Jay for a term of five years. Their aggregate basis for the stock was $18,394.99 and their gain on the sale was $22,767.90 of which $7,589.30 was distributed to petitioner. Will-Jay never engaged in the operation of a luncheonette during the period of *105 time its stock was held by the associates. The associates organized Midlawn Luncheonette, Incorporated (hereinafter sometimes referred to as Midlawn) with a capitalization of three shares of stock which shares were issued, one to each of them, on April 15, 1953. Midlawn was the eighth of the eight corporations. Midlawn entered into a lease on a store located in Seaford, Long Island, on the basis of blueprints of a building then under construction. Upon the completion of the building, the corporation engaged the Bronx Soda Fountain Company to construct luncheonette fixtures on the site. Before the construction of the fixtures was completed, the associates entered into a contract for the sale of their stock in Midlawn. A deposit was given by the purchaser and the payment of the balance due on the purchase price was conditioned upon completion of the construction. Plans for the store, drawn by the fixture company, were shown to the associates and to the purchaser. Certain changes and modifications were made in these plans at the request of the purchaser, who stated his requirements as to the fixtures. The cost of the installed fixtures was approximately $13,000. On November 9, 1953, each *106 of the associates transferred his one share of stock in Midlawn to the purchaser for an aggregate consideration of $23,806. Their aggregate basis for the stock was $14,800 and their gain on the sale was $9,006 of which $3,002 was distributed to petitioner. In connection with the sale of the stock, the associates executed a restrictive covenant which provided that they would not engage in or become interested in a luncheonette or similar business or construct same within a radius of 2,000 square feet in each direction from the address of Midlawn for a term of five years. Midlawn never engaged in the operation of a luncheonette during the period of time its stock was held by the associates. The associates organized Hilltop Luncheonette, Incorporated (hereinafter sometimes referred to as Hilltop) on April 21, 1953, distributing the stock in equal amounts to each of them. Each associate sold his stock in this corporation on May 24, 1954, the associates together realizing therefrom a gain of $29,838 of which $9,946 was distributed to petitioner. The associates organized Plainview Luncheonette, Incorporated (hereinafter sometimes referred to as Plainview) on December 28 1953, distributing *107 the stock in equal amounts to each of them. Each associate sold his stock in this corporation on September 22, 1955, the associates together realizing therefrom a gain of $25,335 of which $8,445 was distributed to petitioner. The associates organized Douglaston Lunch, Incorporated (hereinafter sometimes referred to as Douglaston) on May 5, 1954, distributing the stock in equal amounts to each of them. Each associate sold his stock in this corporation in September 1955, the associates together realizing therefrom a gain of $12,030 of which $4,010 was distributed to petitioner. The associates organized Wantaugh Park Lunch, Incorporated (hereinafter sometimes referred to as Wantaugh) on July 1, 1954, distributing the stock in equal amounts to each of them. Each associate sold his stock in this corporation on March 9, 1955, the associates together realizing therefrom a gain of $10,200 of which $3,400 was distributed to petitioner. The associates organized Massapequa Park Lunch, Incorporated (hereinafter sometimes referred to as Massapequa) on July 6, 1954, distributing the stock in equal amounts to each of them. Each associate sold his stock in this corporation on March 9, 1955, the *108 associates together realizing therefrom a gain of $13,002 of which $4,334 was distributed to petitioner. The associates organized Manton Luncheonette, Incorporated (hereinafter sometimes referred to as Manton) on October 1, 1954, distributing the stock in equal amounts to each of them. Each associate sold his stock in this corporation on July 26, 1955, the associates together realizing therefrom a gain of $6,084 of which $2,028 was distributed to petitioner. The associates, Moses and Teitelbaum organized Eka Luncheonette, Incorporated (hereinafter sometimes referred to as Eka). The stock of Eka was sold by the five organizers in one transaction. Hilltop, Plainview, Douglaston, Wantaugh, Massapequa, Manton, and Eka were not included in the eight corporations sold by the associates during 1951, 1952 or 1953. None of these seven corporations engaged in the operation of luncheonettes during the period of time its stock was held by the associates. The associates organized corporations to limit their personal liability on the leases taken on the various stores and to otherwise limit their liability in connection with the ventures. No sum, other than the regular prepayment of rent, *109 was paid by any of the eight corporations to obtain the lease for the stores in which they had constructed luncheonette fixtures. Whenever a lease was executed by the corporations organized by the associates, it was specified in the lease that the demised premises were to be used exclusively for the establishment of a luncheonette. The associates were regularly looking for locations at which to construct luncheonettes. Their methods of finding suitable locations included personal contact with builders and real estate developers and investigation of newspaper ads. Each of the associates inspected proposed sites for the construction of a luncheonette and all had to agree on the site before a lease on that site was taken. The plans for the fixtures of each luncheonette were submitted to the associates before construction was commenced and the associates often made various changes in the plans that they thought beneficial to the particular site. Petitioner inspected the proposed sites and expressed his opinion to Barasch and Langer as to the merit of each of them. Petitioner participated in the lease negotiations for these sites, and he likewise participated in the negotiations *110 for the sale of the stock held by the associates in each of the eight corporations. Petitioner received no compensation from any of the eight corporations in any of the taxable years in issue. Neither the associates nor any of the eight corporations advertised the stock of the corporation or the business for sale. The sale of the stock of each of the eight corporations was effected through the services of a business broker. Petitioner held the stock in each of the eight corporations for sale to customers in the ordinary course of business. Opinion The petitioner first contends that the statutory notice is void as a matter of law for the reason that a portion of the material offered in explanation of the deficiency was not written in the English language. The portion complained of was as follows: "It has been determined that you realized additional taxable income in the amount shown from the sale of various luncheonettes and/or stock in corporations which constructed luncheonettes for sale and not capital gain income from such sources." Petitioner contends that the phrase "and/or" is not part of the English language and that its use in the paragraph set forth above rendered *111 the entire statutory notice of deficiency void. We do not agree. The Commissioner is required to send to the taxpayer, by registered mail, notice of any deficiency he has determined against the taxpayer. Section 272(a)(1), Internal Revenue Code of 1939. The statute does not prescribe either the form or the substance of the notice, however, the notice, to serve its purpose of affording the taxpayer an opportunity to appeal to this Court, should inform him that a deficiency has been determined and state the taxable period in respect of which it has been assessed. We conclude, after examination of the statutory notice of deficiency mailed to petitioner, that the notice adequately informed petitioner that a deficiency in his income tax had been determined for the specific taxable years in issue. It may be that petitioner's exception to the validity of the statutory notice of deficiency is that the ambiguity in the notice of deficiency created conflicting notices which, because of the conflict, rendered each notice void. Assuming without deciding that the ambiguity gave rise to conflicting notices, nevertheless, this fault would not render either notice void. See Revell, Inc., v. Riddell, 273 F. 2d 649 *112 (C.A. 9, 1959). Respondent determined that the gain petitioner realized from the sale of stock in the eight corporations was ordinary income and not capital gain. He argued in the alternative that petitioner held this stock for sale to customers in the ordinary course of business or that the eight corporations were "collapsible corporations" within the meaning of section 117(m) of the Internal Revenue Code of 1939 so that in either case the gain realized by petitioner upon the sale of the stock is ordinary income. Section 117(a) of the 1939 Code in part provides that the term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include property held by him primarily for sale to customers in the ordinary course of his trade or business. Petitioner contends that he was not in the business of selling securities, suggesting that unless he is found to be a "dealer" in securities, his holding of the stock in issue must be that of an investment and his sale of the stock the sale of an investment and not of property held primarily for sale to customers. As support for this contention, petitioner cites George R. Kemon, 16 T.C. 1026 (1951). *113 In the Kemon case, however, we were dealing with a very different situation. There the question was whether a partnership which regularly engaged in the purchase and sale of many different securities held those securities as an investment or for sale to customers in the ordinary course of business. In respect of this last point we said: Whether or not securities are held primarily for sale to customers in the ordinary course of business is a question of fact, Stern Brothers & Co., 16 T.C. 295, in which the crucial phrase is "to customers." This phrase and the word "ordinary" were added to the definition of capital assets by Senate Amendment No. 66 in the Revenue Act of 1934 so that a speculator trading on his own account could not claim the securities he sold were other than capital assets. The theory of the amendment was that those who sell securities on an exchange have no "customers" and for that reason the property held by such taxpayers is not within the above quoted exclusionary clause. O. L. Burnett, 40 B.T.A. 605, 118 F. 2d 659; Thomas E. Wood, 16 T.C. 213. In determining whether a seller of securities sells to "customers," the merchant *114 analogy has been employed. * * * [citations omitted] Those who sell "to customers" are comparable to a merchant in that they purchase their stock in trade, in this case securities, with the expectation of reselling at a profit, not because of a rise in value during the interval of time between purchase and resale, but merely because they have or hope to find a market of buyers who will purchase from them at a price in excess of their cost. This excess or mark-up represents remuneration for their labors as a middle man bringing together buyer and seller, and performing the usual services of retailer or wholesaler of goods. * * * [citation omitted]. Such sellers are known as "dealers." Contrasted to "dealers" are those sellers of securities who perform no such merchandising functions and whose status as to the source of supply is not significantly different from that of those to whom they sell. That is, the securities are as easily accessible to one as the other and the seller performs no services that need be compensated for by a mark-up of the price of the securities he sells. The sellers depend upon such circumstances as a rise in value or an advantageous purchase to enable *115 them to sell at a price in excess of cost. Such sellers are known as "traders." 16 T.C. at 1032. See Pacific Affiliate, Inc., 18 T.C. 1175, 1212 (1952), and J. C. Bradford, 22 T.C. 1057, 1068 (1954), where we have reiterated these views. Although petitioner was not a "dealer in securities" in the sense that the term is used with reference to taxpayers who regularly engage in buying and selling many different securities, we note that petitioner did not sell the stock of the eight corporations on an exchange but together with Barasch and Langer personally negotiated each individual sale and that he and his associates organized these corporations, each taking back one share of stock with the expectation of selling it at a profit, not because of a rise in value during the interval of time between organization and sale, but because they had hopes of finding a market of buyers who would purchase the stock from them in excess of their cost. The excess which the associates expected to receive over their cost was remuneration for their services not as retailers, wholesalers, or middlemen, but rather as promoters and creators of luncheonette businesses. *116 In addition, the status of the associates as to their source of supply of the stock sold (organizers and developers of the corporate ventures) was significantly different from the status of the purchasers as to these securities. Moreover, the associates can as easily be said to have sold the equipped luncheonettes and leaseholds as the stock in the eight corporations which held title to the fixtures and in whose names the leases were taken. There appears to be but slight difference between the facts of this case and those of S. Nicholas Jacobs, 21 T.C. 165 (1953), affd. 224 F. 2d 412 (C.A. 9, 1955), where we disregarded the corporate entity and held that the petitioner had ordinary income from the sale of real estate and not capital gain from the sale of stock of a corporation in which the title to the real estate was placed. The question then is whether petitioner held the stock in the eight corporations, or his interest in the luncheonettes and leaseholds, for sale to customers in the ordinary course of his trade or business. We have held, and it is well recognized, that an individual may engage in two or more businesses. C. E. Mauldin, 16 T.C. 698, 709 (1951), *117 affd. 195 F. 2d 714 (C.A. 10, 1952); J. Roland Brady, 25 T.C. 682, 689 (1955). Here, although petitioner was primarily engaged in the wholesale ice cream business, he was actively engaged in the development and sale of luncheonette sites. Petitioner's activity with respect to the development and sale of luncheonette sites included the investigation of locations, the negotiation of leases on locations found to be favorable, the appraisal of plans drawn by the fixture company for each store, and the negotiation of the sale of the stock of the eight corporations. Taking into account the work that had to be done for the finding and development of the luncheonette sites, we find that petitioner devoted the time necessary to the accomplishment of his and the associate's business objective. The cases deciding whether property was held for sale to customers in the ordinary course of business are legion. Many of these cases deal with the subdivision and sale of real estate. More significant than an enumeration of the many cases is an examination of the factors or tests in these cases which the courts have found most relevant. In setting forth these factors or tests, *118 the courts have been careful to point out that no one of them can be regarded as determinative of the issue but that the question, whether property was held for sale to customers in the ordinary course of business, must be viewed in the light of all pertinent factors and particularly the facts of the individual case. Bauschard v. Commissioner, 279 F. 2d 115, 118 (C.A. 6, 1960); Kaltreider v. Commissioner, 255 F. 2d 833 (C.A. 3, 1958); Wellesley A. Ayling, 32 T.C. 704, 708 (1959); James G. Hoover, 32 T.C. 618, 625 (1959); Solly K. Frankenstein, 31 T.C. 431, 434 (1958); W. T. Thrift, Sr., 15 T.C. 366 (1950). One such factor is the purpose for which the property was acquired. On the one hand we have petitioner's testimony that it was the intention of the associates to open up a chain of luncheonettes. On the other, we have the uncontroverted facts of their operations. Even if the original intent of the associates was to open and operate a chain of luncheonettes, which we do not believe was the case, it is not the original intent that is relevant but rather the purpose for which the property was held at the *119 time of its sale. Mauldin v. Commissioner, supra; Raymond Bauschard, 31 T.C. 910 (1959), affd. Bauschard v. Commissioner, supra.The associates sold the stock of seven of the eight corporations before commencing operation of the luncheonette. In the case of the one luncheonette they operated, their operation prior to sale of the stock was for a period of approximately one month. Petitioner has not introduced any evidence that would permit us to find that any of the eight corporations was organized with sufficient capital to make operations possible. What evidence there is in the record suggests that very little, if any, capital was contributed to these corporations and then only such capital as was necessary for the development of the physical plant. Analysis of the dates of organization and sale of stock in the eight corporations reveals that the associates were seeking out new sites for development and organizing new corporations even as they were selling the old. Solly K. Frankenstein, supra.
A second factor to be considered is the development of the property between the time of its acquisition and the time of its sale. After the negotiation *120 of each lease, the associates had the fixture contractor construct the necessary fixtures to convert an empty store into a fully equipped luncheonette. The nature of the development depends, of course, on the property involved, the significant elements being that the development involve the use of skill, capital, and business activity. J. Roland Brady, supra, at p. 689. That the corporations rather than petitioner, Barasch, and Langer contracted for the development of these sites is immaterial. In Walter H. Kaltreider, 28 T.C. 121 (1957), affd. Kaltreider v. Commissioner, supra, the question was whether the activities performed by the petitioners in respect of the development and sale of acreage constituted a trade or business. We said there that what was relevant were the activities of petitioners or those acting on their behalf; that one may conduct a business through agents; that development and sales activities were carried on by a corporation controlled by petitioners; and that what was done by the corporation was done at the instance and for the benefit of the petitioners as their agent. In Raymond Bauschard, supra, we said *121 that the fact that one of the venturers acted through the medium of his controlled corporation did not change the result that he and his coventurer held the property for sale to customers in the ordinary course of business. If the corporate entities in this case be disregarded, as well they may be, S. Nicholas Jacobs, supra, the development and sales activities of Barasch and Langer, as joint venturers, may be attributed to the petitioner. Morris W. Zack, 25 T.C. 676, 681 (1955); J. Roland Brady, supra; Raymond Bauschard, supra.
At the trial, petitioner brought out that neither the associates nor the corporations ever advertised the stock or the equipped luncheonettes for sale. Purchasers were brought to the associates by business brokers known to them, ostensibly unsolicited by the associates. However, we have held, in respect of the sale of real estate, that where there is a seller's market it is not essential that active sales promotion be demonstrated in order to prove that a taxpayer is engaged in the business of selling real estate. Solly K. Frankenstein, supra.Prior to the latter case, we said that advertising *122 is merely a means for finding customers and that where an active market exists and potential customers are known, the employment of conventional methods of advertising may not be essential. J. Roland Brady, supra.See also Arthur E. Wood, 25 T.C. 468 (1955). The number and frequency of sales, another factor to be considered, must be related to the type of property sold. A review of the evidence permits, in our opinion, the conclusion that the organization, development, and sales activities of the associates were numerous, frequent, and continuous. In 1950, the associates organized two corporations. In 1951 they organized four corporations and one partnership and sold their stock in three corporations and the property of the partnership. In 1952, they organized five corporations, sold their stock in two corporations, and liquidated one corporation after it had sold its assets. In 1953 they organized and sold their stock in three corporations. In 1954 they organized and sold their stock in four corporations. In 1955 they sold their stock in five corporations. Although the years subsequent to 1953 are not in issue in this proceeding, the activities of the *123 associates in those years are relevant to a determination of whether the activities of the associates in the earlier years were part of a uniform course of action. Lockhart v. Commissioner, 258 F. 2d 343, 348 (C.A. 3, 1958); Ehrman v. Commissioner, 120 F. 2d 607, 610 (C.A. 9, 1941); James G. Hoover, supra. Another factor often considered is the period of time property is held by the taxpayer before its sale. In Raymond Bauschard, supra, we considered as a significant factor the relatively short lapse of time between the various acts of acquisition, development, and ultimate sale of a tract of land. In finding this short lapse of time, we were able to distinguish that case from those cases involving a casual liquidation of a capital investment acquired either by purchase or inheritance and held for a prolonged period of time. Comparison of the organization and sale dates for the eight corporations in issue reveals that the associates held the stock of these corporations for an average period of 9.9 months. A similar comparison for the nine corporations sold in 1954 and 1955 reveals an average holding period of 15.8 months. Recalling *124 that many of the corporations formed by the associates were organized to take leases on premises not yet constructed, or then under construction, the period of time the associates held the stock of these corporations appears related to the development of the luncheonettes and the sale of the stock and not the holding of the stock as an investment. Consideration of all the evidence, in connection with the factors said by the courts to be relevant to a determination whether property is held primarily for sale to customers in the ordinary course of business and in connection with the fundamental objective of the capital gain provisions of the Code, compels our conclusion that the stock in the eight corporations, sold by petitioner during the taxable years in issue, was held by him for sale to customers in the ordinary course of business and accordingly was not a capital asset in his hands. Having found the stock not to have been a capital asset in petitioner's hands and the gain therefrom to be ordinary income, we do not find it necessary to discuss respondent's alternative contention that the eight corporations were "collapsible corporations" within the meaning of section 117(m) of *125 the Code. The respondent determined additions to the tax for 1951 under section 294(d)(1)(A) for failure to file a declaration of estimated tax and for 1952 under sections 294(d)(1)(B) for failure to pay installments of estimated tax declared and 294(d)(2) for substantial underestimation of estimated tax. Petitioner has adduced no evidence whatsoever with respect to this issue and accordingly we approve the assertion of such additions, those for 1952 concurrently. Chris J. Sherlock, 34 T.C. - (June 20, 1960). Decision will be entered for the respondent.