CLINTON E. GATES AND LUCILLE A. GATES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2073–68.    Filed August 28, 1969.

*Eli Block*, for the petitioners.
*Alan B. Shidler*, for the respondent.

TIETJENS, *Judge:* The Commissioner determined deficiencies in petitioners' income taxes of $1,310.14, $1,842.59, and $477.82, respectively, for 1963, 1964, and 1965.

We must decide whether petitioners are entitled to have the gains from their sales of real estate lots during each of these years taxed at capital gain rates rather than at ordinary-income rates.

All of the facts have been stipulated and are so found. The stipulation and the exhibits attached thereto are incorporated herein by this reference.

Petitioners Clinton E. Gates and Lucille A. Gates (hereinafter referred to as Clinton and Lucille, respectively), husband and wife, resided in Janesville, Wis., at the time they filed their petition herein. They filed joint Federal income tax returns with the district director of internal revenue, Milwaukee, Wis., for each of the years in question. They are cash basis taxpayers.

Since 1940 Clinton has been the manager of a retail lumberyard in Janesville. The business, incorporated in 1959 under the name of Gates Lumber Co., Inc., sells lumber, millwork, building supplies, sheathing material, and flooring, etc. It had 12 employees during the years in question. Lucille has always been active in the business as bookkeeper. For the years 1960 through 1966, Clinton, Lucille, and Clinton's mother have been the sole officers and directors of the company. Throughout these years, Clinton owned 74.5 percent of the company's outstanding stock while Lucille owned the remaining 25.5 percent.

In 1954 Clinton purchased Fairlane Park Addition, a tract of land in a residential area of Janesville, for $47,000. In 1955 he subdivided this tract into 89 contiguous lots and installed necessary improvements as needed therein. During the years 1955 through 1966, Clinton sold lots in Fairlane Park Addition in the following numbers:

| | | | | | |
|---|---|---|---|---|---|
| 1955 | 1 | 1959 | 6 | 1963 | 13 |
| 1956 | 2 | 1960 | 9 | 1964 | 18 |
| 1957 | 2 | 1961 | 12 | 1965 | 10 |
| 1958 | 1 | 1962 | 9 | 1966 | 4 |

The following schedule represents sales information with respect to the sales of lots in Fairlane Park Addition for the years 1963 through 1966:

| Buyer | Year | Gross sales price [1] | Allocated cost of lot | Reimbursed cost of improvements | Gain |
|---|---|---|---|---|---|
| Howard Larsen | 1963 | $2,317 | $400 | $1,217 | $700 |
| Howard Larsen | | 1,163 | 400 | 263 | 500 |
| Robert K. Vingers | | 1,546 | 700 | 346 | 500 |
| Robert K. Vingers | | 1,100 | 700 | --------- | 400 |
| Robert K. Vingers | | 1,100 | 700 | --------- | 400 |
| Robert K. Vingers | | 1,476 | 700 | 276 | 500 |
| Alain L. Pardee | | 1,476 | 700 | 276 | 500 |
| Alain L. Pardee | | 1,476 | 700 | 276 | 500 |
| Alain L. Pardee | | 1,476 | 700 | 276 | 500 |
| Byron G. Miller | | 1,840 | 400 | 1,040 | 400 |
| Lowell Houge | | 1,100 | 700 | --------- | 400 |
| _____ Schwartz | | 1,063 | 400 | 263 | 400 |
| David O. Barden | | 1,140 | 700 | --------- | 440 |
| William E. Miess (refund) | | (100) | --------- | --------- | (100) |
| | | 18,173 | 7,900 | 4,233 | 6,040 |
| James Cogan | 1964 | 1,200 | 384 | 493 | 816 |
| James H. Wagner | | 1,100 | 684 | --------- | 416 |
| James H. Wagner | | 1,100 | 684 | --------- | 416 |
| Lowell Houge | | 1,100 | 684 | --------- | 416 |
| Robert K. Vingers | | 1,100 | 684 | --------- | 416 |
| Robert K. Vingers | | 1,200 | 684 | 1,005 | 516 |
| Robert K. Vingers | | 1,100 | 684 | --------- | 416 |
| Robert K. Vingers | | 1,100 | 684 | --------- | 416 |
| Alain L. Pardee | | 925 | 384 | 900 | 541 |
| Alain L. Pardee | | 1,100 | 684 | --------- | 416 |
| Alain L. Pardee | | 1,100 | 684 | --------- | 416 |
| Alain L. Pardee | | 1,100 | 684 | --------- | 416 |
| J. Timbur Homes, Inc. | | 850 | 384 | 404 | 466 |
| Gordon L. Jorgensen | | 1,100 | 684 | --------- | 416 |
| Ronald J. Arnold | | 800 | 384 | 1,140 | 416 |
| _____ Walker | | 1,100 | 684 | --------- | 416 |
| Clarence M. Thompson | | 850 | 384 | 688 | 466 |
| Arnold & Miller | | 1,100 | 684 | --------- | 416 |
| | | 19,025 | 10,812 | 4,630 | 8,213 |
| James H. Wagner | 1965 | 900 | 384 | 1,025 | 516 |
| James H. Wagner | | 900 | 384 | 1,160 | 516 |
| Alain L. Pardee | | 1,100 | 684 | --------- | 416 |
| Alain L. Pardee | | 800 | 384 | 277 | 416 |
| Robert K. Vingers | | 1,100 | 684 | --------- | 416 |
| Robert K. Vingers | | 1,100 | 684 | --------- | 416 |
| Robert K. Vingers | | 1,100 | 684 | --------- | 416 |
| Arnold & Miller | | 1,100 | 684 | --------- | 416 |
| Arnold & Miller | | 1,100 | 684 | --------- | 416 |
| P. K. Smith | | 750 | 384 | 1,060 | 366 |
| | | 9,950 | 5,640 | 3,522 | 4,310 |
| Robert K. Vingers | 1966 | 800 | 684 | --------- | 116 |
| Lowell Houge | | 825 | 384 | --------- | 441 |
| Alain L. Pardee | | 1,100 | 684 | --------- | 416 |
| Alain L. Pardee | | 800 | 384 | --------- | 416 |
| | | 3,525 | 2,136 | --------- | 1,389 |

The approximate percentage of the total cost of improvements to the total cost of the lots sold in Fairlane Park Addition was 54 percent in 1963, 43 percent in 1964, and 80 percent in 1965.

Most of these sales were to builders and contractors who bought the lots for the purpose of constructing homes thereon. The following persons are builders and contractors who purchased building materials

[1] The sales information figures are shown as stipulated. "Gross Sales Price" for 1963 refers to the gross sales price of the land and improvements, so that "Gain" for 1963 is computed as "Gross Sales Price" less the sum of the "Allocated Cost of Lot" and "Reimbursed Cost of Improvements." "Gross Sales Price" for 1964 and 1965 refers to the gross sales price of the land, only, so that "Gain" for these years is computed as "Gross Sales Price" less "Allocated Cost of Lots."

and supplies from the Gates Lumber Co. during the years involved herein:

| | |
|---|---|
| Howard Larsen | James H. Wagner |
| Robert K. Vingers | J. Timbur Homes, Inc. |
| Alain L. Pardee | Ronald Arnold & Byron Miller |
| Lowell Houge | Claude W. Griffith |
| David O. Barden | |

These persons purchased from the Gates Lumber Co. substantially all the lumber and building materials they used in building homes on the lots they purchased in Fairlane Park Addition.

The following schedule shows the cost to various builders and contractors of lumber materials and supplies purchased from the Gates Lumber Co. with respect to lots purchased in Fairlane Park Addition during the taxable years in issue:

| Purchaser | Year of purchase | Number of lots | Cost of materials purchased |
|---|---|---|---|
| Arnold & Miller | 1963 | 1 | $6, 553. 23 |
| | 1964 | 2 | 10, 632. 79 |
| | 1965 | 2 | ---------- |
| Alain L. Pardee | 1963 | 3 | 17, 638. 60 |
| | 1964 | 4 | 20, 134. 87 |
| | 1965 | 2 | 5, 214. 09 |
| Robert K. Vingers | 1963 | 4 | 22, 883. 69 |
| | 1964 | 5 | 19, 740. 71 |
| | 1965 | 4 | 21, 161. 68 |
| James H. Wagner | 1964 | 2 | 6, 792. 64 |
| | 1965 | 2 | 15, 789. 52 |
| Lowell Houge | 1963 | 1 | 5, 624. 69 |
| | 1964 | 1 | 5, 796. 79 |
| Howard Larsen | 1963 | 2 | 10, 097. 12 |

Petitioners' general policy was to tie the sale of a lot with the sale of substantially all the lumber materials and supplies that would be used to build improvements thereon. This policy was followed with regularity with respect to the sale of lots to builders and contractors. Several contracts for the sales of lots specifically required the purchaser to buy his building materials and supplies from the Gates Lumber Co. Some builders felt morally obligated to or felt there was a mutual understanding that they would buy their lumber and materials from the company. Claude W. Griffith and Robert K. Vingers believed that if they did not purchase their materials from the company the petitioners would refuse to sell them any more lots. William E. Meiss, who purchased lots in the Fairlane Park Addition in 1962, purchased his materials from the company because he felt an obligation to do so. He is no longer building in that addition as he wants to feel free to purchase his materials elsewhere. In addition to the Gates Lumber Co., there were five lumber material and supply businesses in the Janesville area during the taxable years in question.

During the taxable years in issue and in years prior and subsequent thereto, it was generally known among builders and contractors and

other people in Janesville that Clinton had lots for sale. Ronald J. Arnold and Claude W. Griffith had specific knowledge that Clinton had lots for sale as a result of their meeting with him at the Gates Lumber Co. in the spring of 1963. Clinton neither advertised his lots for sale nor otherwise engaged in the active promotion of such sales. He maintained no sales office and employed no one to promote or handle any lot sales. His sales resulted from his being contacted by prospective purchasers, consisting primarily of the builders and contractors above referred to who actually purchased most of the lots. Clinton was personally involved in the negotiations for the lot sales. He kept books and records with respect to the acquisitions and sales of lots.

The lots were purchased because of their desirable location for residences and because the prices for the lots were considered to be reasonable. Clinton generally extended credit to builders and contractors with respect to their lot purchases. After they obtained construction loans, the proceeds would be used to pay for the lot. Payment usually preceded construction of the residence. On at least one occasion, payment was made upon completion of the residence. Title would generally pass upon payment.

Clinton reported the gain from his sales of lots in Fairlane Park Addition, $6,040 in 1963, $8,213 in 1964, and $4,310 in 1965, as long-term capital gain from the sale of capital assets held for more than 6 months.

In February 1960, Lucille purchased a tract of land in Janesville known as Southgate Addition for $18,131.50, title to which was taken in her name. Clinton was involved in the negotiation for the purchase of Southgate Addition and the purchase was made with funds from petitioners' joint bank account. Later that year, petitioners subdivided Southgate Addition into 46 contiguous lots and installed improvements as needed therein. On August 19, 1960, Lucille imposed certain restrictive covenants upon each lot in Southgate Addition. The document in which the restrictions were set forth recited that Lucille, as owner of all the lots in Southgate Addition, "being about to sell lots included in said subdivision and desiring to provide for the continued attractiveness and desirability of all the lots and of the entire neighborhood embraced in * * * [Southgate] does hereby impress upon each lot in * * * [Southgate] the following restrictions * * *." The restrictions provided that no lot should be used except for residential use with the dwellings thereon meeting certain cost and architectural specifications. No building was to be erected on any lot until the construction plans and specifications had been approved by the "Architectural Control Committee," consisting of Lucille, Clinton, and Paul E. Macke.

Lucille sold seven lots in Southgate Addition in September 1960, and sold other lots in Southgate as follows: 1961—7, 1962—4, 1963—1, 1964—1, 1965—4, 1966—4.

The following schedule represents sales information with respect to the sales of lots in Southgate Addition for the years 1963 through 1966:

| Buyer | Year | Gross Sales Price [2] | Allocated cost of lot | Reimbursed cost of improvements | Gain |
|---|---|---|---|---|---|
| Stanley Cerney | 1963 | $2,021 | $600 | $1,304 | $117 |
| Art Meissner | 1964 | 1,776 | 1,200 | ---------- | 576 |
| Joseph W. Frei | 1965 | 600 | 420 | ---------- | 180 |
| Joseph W. Frei | | 750 | 420 | 925 | 330 |
| Wilmer Herr | | 500 | 420 | 1,175 | 80 |
| Wilmer Herr | | 400 | 420 | 1,470 | (20) |
| | | 2,250 | 1,680 | 3,570 | 570 |
| Joseph W. Frei | 1966 | $750 | $420 | ---------- | $330 |
| Joseph W. Frei | | 750 | 420 | ---------- | 330 |
| James H. Wagner | | 500 | 420 | ---------- | 80 |
| James H. Wagner | | 500 | 420 | ---------- | 80 |
| | | 2,500 | 1,680 | ---------- | 820 |

Clinton was involved in the negotiations for the sale of lots in Southgate Addition.

On May 29, 1964, Clinton purchased a third tract of land in Janesville known as Fourth Blackhawk Woods Addition for $74,383. On that same day, he also purchased from the seller of this tract two improved lots in Second Blackhawk Woods Addition for $4,818 as follows:

| | Land | Improvements | Total |
|---|---|---|---|
| Lot 1 | $1,250 | $1,109 | $2,359 |
| Lot 2 | 1,250 | 1,209 | 2,459 |
| Total | | | 4,818 |

Approximately a year later Clinton subdivided two-thirds of Fourth Blackhawk Woods Addition into 33 contiguous lots. In 1965 he sold the unplatted parcel in Fourth Blackhawk Woods Addition to J. Timbur Homes, Inc., for $6,500, realizing a gain of $1,086 over its $5,414 allocated cost. This gain was reported on petitioners' 1965 return as a short-term capital gain. In 1966 he sold 10 lots in Fourth Blackhawk Woods Addition. The gains from the sales of these lots were reported on petitioners' 1966 return as short-term capital gains. The following schedule represents information with respect to the sales of the 10 lots in Fourth Blackhawk Woods Addition in 1966:

2 The sales information figures are shown as stipulated. "Gross Sales Price" for 1963 refers to the gross sales price of the land and improvements, so that "Gain" for 1963 is computed as "Gross Sales Price" less the sum of the "Allocated Cost of Lot" and "Reimbursed Cost of Improvements." "Gross Sales Price" for 1964 and 1965 refers to the gross sales price of the land, only, so that "Gain" for these years is computed as "Gross Sales Price" less "Allocated Cost of Lots."

| Buyer | Year | Gross sales price— land only | Allocated cost of lot | Reimbursed cost of improvements | Gain |
|---|---|---|---|---|---|
| Robert K. Vingers | 1966 | $2,500 | $2,138 | $1,892 | $362 |
| Robert K. Vingers | | 2,300 | 1,589 | 1,479 | 711 |
| Robert K. Vingers | | 2,400 | 1,560 | 1,421 | 840 |
| Robert K. Vingers | | 2,000 | 1,415 | 567 | 585 |
| Robert K. Vingers | | 2,300 | 1,560 | 1,410 | 740 |
| Verne E. Vollrath | | 2,800 | 1,922 | 1,747 | 878 |
| Claude W. Griffith | | 2,000 | 1,415 | 567 | 585 |
| Claude W. Griffith | | 2,000 | 1,415 | 567 | 585 |
| Alfons J. Dusik | | 2,000 | 1,415 | 567 | 585 |
| Lowell Houge | | 2,000 | 1,415 | 567 | 585 |
| | | 22,300 | 15,844 | 10,784 | 6,456 |

In 1966 Clinton sold one of the two improved lots in Second Blackhawk Woods to Herman K. Anderson for $3,350, realizing a gain of $850 over its $2,500 allocated cost. This gain was reported on petitioners' 1966 return as a short-term capital gain.

Petitioners also sold a lot in Wesley Court, acquired in 1962, in 1964 for $2,500, realizing a loss of $600 which was reported in their 1964 return as a short-term capital loss.

Petitioners received the following amounts of income from their sale of lots during the taxable years in issue:

*1963*
Southgate ---------- $117
Fairlane Park ------ 6,040
6,157

*1964*
Southgate ------- $576
Wesley Court --- (600)
Fairlane Park --- 8,213
8,189

*1965*
Unplatted parcel- $1,086
Fairlane Park --- 4,310
Southgate ------ 570
5,966

The Commissioner determined that petitioners' gains from their sales of lots in Southgate Addition and in Fairlane Park Addition during 3 years resulted in ordinary income and not long-term capital gain as reported on petitioners' returns.

We must decide whether the lots petitioners owned in these additions were held by them primarily for sale to customers in the ordinary course of their trade or business within the meaning of section 1221(1), I.R.C. 1954.[3] The gain from the sale of any lot so held is taxable as ordinary income rather than as gain from the sale of a capital asset.

"Primarily," as used in section 1221(1), has been construed as meaning "of first importance" or "principally." *Malat* v. *Riddell*, 383 U.S. 569 (1966). The purpose of section 1221(1) is to distinguish between the profits and losses arising from the everyday operation of a business on the one hand and the realization of appreciation in value accrued over a substantial period of time on the other. *Malat* v. *Riddell, supra.*

[3] All statutory references are to the Internal Revenue Code of 1954 unless otherwise stated.

Property may be originally acquired primarily for investment purposes and held for appreciation for a period of years. It is the purpose for which the property is held *at the time of sale*, however, which is determinative of the taxable nature of the gain. *S. O. Bynum*, 46 T.C. 295 (1966). Accordingly, there is not an exact correspondence between appreciation income and capital gains treatment on the one hand and business profit and ordinary-income treatment on the other. If the property is of the nature of inventory in the taxpayer's hands at the time of sale all the gain is taxable to him as ordinary income.

For whatever purpose Clinton initially purchased Fairlane Park Addition, we are persuaded that the lots in that addition were held by him during the taxable years in question primarily for sale in the ordinary course of a business of his. Certainly the lots were held for sale. Petitioners do not contend otherwise. Rather they contend the lots were held for sale primarily for the purpose of liquidating an investment which Clinton had held for a period of years. We think the evidence is otherwise. Of the 41 lots sold in this addition during the taxable years 35 were sold to builders and contractors in effectuation of petitioners' general policy of tying lot sales with Gates Lumber Co.'s sales of building materials to the purchasers of such lots. The cost totals of lumber materials and supplies that such builders and contractors purchased from the Gates Lumber Co. with respect to the lots they purchased in Fairlane Park during 1963, 1964, and 1965 were $62,797.33, $63,097.80, and $42,165.29, respectively, or an average of about $5,000 of sales of building materials per lot. This average compares with an average gain from the sales of such lots of about $450 per lot. Under these circumstances the sales cannot be said to be the passive liquidation of investment property. *E. Aldine Lakin*, 28 T.C. 462 (1957). On the contrary, the sales constituted a business. The lots were held primarily for sale to builders and contractors in the ordinary course of that business. Any purpose to hold these lots for future appreciation or to liquidate an investment were merely incidental. Accordingly, we hold the gains from the sales of lots in Fairlane Park Addition during the years in question are taxable as ordinary income.

We also think the lots in Southgate Addition were held primarily for sale. The tract was purchased in February 1960 for about $18,000. It was very shortly subdivided into 46 contiguous lots and substantial improvements were installed therein. By August 1960, Lucille was already prepared to sell lots and in fact she sold 7 lots during September of that year, about 7 months after she purchased the tract. The close proximity in time of her sales of lots with her purchase of the tract is indicative that her original purpose in acquiring the tract was to subdivide it and sell the lots, rather than to hold the lots for future appreciation. Her regular and continuous sales of lots since September

1960 is indicative of her continuing intention to hold the lots primarily for sale. There is no evidence of an intent to hold the lots for future appreciation. There is no evidence that Lucille ever refused to sell a lot because she considered it would appreciate further in value. On the contrary, her regular and continuous sales of several lots is more consonant with an intention to sell the lots whenever there appeared a willing buyer. We attach little significance to the fact that these lots were not advertised for sale, from which only a weak negative inference can be drawn. It appears to have been widely known that both Clinton and Lucille had lots for sale.

The petitioners contend that the lots in Southgate Addition were not held primarily for sale to customers in the *ordinary course* of a *trade or business*. With respect to this question, we do not consider the character of these lots in Lucille's hands to be "tainted" either by Clinton's transactions in other real estate properties or by petitioners' conduct of their lumber business. The lots in Southgate Addition were not held, as were the lots in Fairlane Park, primarily for sale to builders and contractors. No lot in Southgate Addition was sold during the taxable years in question to either a builder or contractor. There is no evidence whatsoever that the restrictive covenants imposed on these lots were intended to promote or in fact resulted in sales by the Gates Lumber Co. There is no evidence that any substantial amount of materials used in the construction of residences on these lots was purchased from the lumber company.

We think, nevertheless, that the lots were held primarily for sale to customers in the ordinary course of a trade or business of Lucille's. When she bought the land, subdivided it, installed improvements, and immediately sold lots therein, she went into the business of selling lots in that addition, irrespective of any of her other activities. The land was not acquired for investment purposes. It was never held for investment purposes. The gain from the sale of lots appears to have been the consequence of the fact that subdivided and improved realty is worth more than the sum of the land, platting, and improvements. When Lucille purchased Southgate, subdivided it, and installed improvements therein, she entered into the business of creating that increment in value. The lots were held for sale primarily for the purpose of realizing that increment in value, not for the purpose of liquidating investment property. The "customers" of her business appear to be any willing buyers to whom she sold in the ordinary course of her business of selling lots in Southgate Addition. Accordingly, we hold that Lucille's gains from the sales of lots in Southgate Addition during the years in question are taxable to her as ordinary income.

*Decision will be entered for the respondent.*