JOHN S. BANAS and JOSEPHINE F. BANAS, Petitioners v. COMMISSIONER OF INTERNAL REVENE, Respondent
Banas v. Commissioner
Docket No. 666-77.
United States Tax Court
T.C. Memo 1979-188; 1979 Tax Ct. Memo LEXIS 337; 38 T.C.M. (CCH) 797; T.C.M. (RIA) 79188; May 15, 1979, Filed *337 Petitioner sold a parcel of land overburdened with loam to a developer. He retained the right to require that any loam removed from the land by the developer be deposited on neighboring land he still owned. Loam was deposited on the land and petitioner immediately embarked on a course of action lasting 10 years in which he marketed the loam. Held: petitioner was in the business of selling loam. Held further: petitioner is not entitled to deplete his interest in the loam. Richard F. Buckley, for the petitioners. W. Terrence Mooney, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent determined deficiencies in petitioners' income taxes paid for the following taxable years and in the following amounts: Taxable Year Ended
Amounts of Deficiencies
December 31, 1971
$1,363.91
December 31, 1972
2,758.39
December 31, 1973
190.54
After concessions, the only issues for our decision are whether or not Mr. Banas was in the trade or business of selling loam during the taxable years in issue and whether or not he is entitled to an allowance for depletion on such sales of loam. Our determination of these issues will affect petitioners' allowable medical expense deduction. FINDINGS *339 OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners John S. and Josephine F. Banas, husband and wife, resided in Springfield, Massachusetts at the time the petition herein was filed. They filed their returns for their taxable years ended December 31, 1971, 1972, and 1973 with the internal revenue service center, Andover, Massachusetts. Petitioners account for their income on a cash receipts and disbursements method and use the calendar year as their tax accounting period. As Mrs. Banas is a party hereto solely by virtue of having filed jointly with her husband, "petitioner" shall hereinafter be used to refer to Mr. Banas. In 1968 petitioner was the owner of a certain parcel of real property located in Springfield, Massachusetts. He had purchased the property for approximately $10,000 in 1945. Sometime prior to August 26, 1968 petitioner and the representatives of the Ashley Realty Trust (Ashley) entered into negotiations for the sale and purchase of this property. The land involved was, at that time, an unimproved, vacant parcel *340 of land overburdened with hillocks of loam. Ashley wanted to purchase the parcel and build a shopping center complex thereon. Petitioner had an original asking price of $1,200,000. On August 26, 1968, however, the parties entered into a purchase and sale agreement in which petitioner sold, and Ashley purchased, the parcel for a price of $1,066,000. The purchase agreement was consummated and the title to the land vested in Ashley on or about October 1, 1968. One of the impediments to the development of the parcel Ashley bought was its overburden of loam. Local law, as well as engineering considerations, required that Ashley grade and level the land before it could build the shopping center. Leveling the land entailed the removal therefrom of a large part of the parcel's loam overburden. In an attempt to realize $1,200,000 from the property petitioner entered into a supplemental agreement, dated August 26, 1968, with Ashley whereby he retained the right to require that all the loam removed from the parcel being developed be dumped on other parcels of land still owned by him which were adjacent to the parcel under development. The amount of loam to be removed and deposited was *341 dependent solely upon the removal needs of Ashley. In the months that followed, and within the calendar year 1968, large amounts of loam were deposited upon petitioner's land. Within two months of the close of the sale transaction all the excess loam on Ashley's parcel had been deposited on petitioner's neighboring land. Petitioner immediately began to take steps to sell the loam. He posted signs on his land where the loam had been deposited and advertised in local newspapers. Petitioner sold his first load of loam in 1968 and continued to sell loam through at least September of 1978. During the taxable years in issue the price of good quality, filtered loam was approximately $3 per square yard. Petitioner did not sift or otherwise treat or improve his loam, but sold it exactly as it had been deposited upon his land at a price of $1.25 to $1.50 per square yard. At these selling prices petitioner could have reasonably hoped to realize the shortfall of $134,000 on his selling price of the property from the sale of loam only if he had between 89,333.33 and 107,200 square yards of loam on his land. Ashley at no time undertook to guarantee that petitioner would receive any profit *342 from this loam. Petitioner continously advertised the sale of loam in local newspapers. He ran between two and four ads per month in a variety of local newspapers including the Springfield Sunday Republican, The Ludlow Register, The Springfield Herald, and the Reminder. Petitioner's advertisements took the form of either separate block type or classified "ads." In addition to using newspapers to advertise the sale of his loam petitioner had at least one sign on his land advertising the sale of his loam at all times. All signs on petitioner's land advertising the sale of loam faced roads which went by his land and were directed at travelers on these roads. Petitioner did not perform any act with respect to his loam other than to advertise and sell it. If a purchaser did not have his own truck in which to remove loam he had purchased, it was petitioner's practice to give the customer the name of a trucker who could move the loam. Sometimes petitioner called a trucker himself to help arrange delivery, but petitioner neither paid for the delivery of loam purchased from him nor delivered the loam himself. While petitioner made several attempts at selling all his loam in bulk *343 to one purchaser, there was no local market for such a large amount of loam and no such customer was ever found. Petitioner's average customer bought between 300 and 500 square yards at a time while his larger customers bought up to 1,500 square yards at a time. By the time of the trial herein, petitioner had sold most of the loam on his land and had ceased advertising the sale thereof. On his calendar year 1971 Federal income tax return taxpayer reported gross receipts on the sale of loam of $7,127.10. From this amount he deducted $604.14 as advertising costs. Petitioner included the entire excess of this amount, i.e. $6,522.96, in gross income as long term capital gain for that taxable year. On his 1972 taxable year income tax return, petitioner reported gross receipts of $11,543.26 from the sale of loam, deducted $346.74 as advertising costs, and included the entire excess in gross income as long term capital gain. [1] On his calendar year 1973 income tax return petitioner reported gross receipts from the sale of loam of $1,648. He deducted $286.98 as advertising expenses and included the excess, $1,361.02, in gross income as long term capital gain. *344 During the years in issue, besides selling loam, petitioner operated a real estate brokerage business, a rental business, and owned stock in a corporation operating a liquor store. In 1971 the brokerage business lost $1,525.37 while the rental business showed net income of $1,274.75. No amount of income was reported from petitioner's interest in the liquor store. The vast majority of petitioner's 1971 income was from interest. Interest income in that taxable year amounted to $35,963.13 or 92.27 percent of petitioner's adjusted gross income of $38,973.99 for that taxable year. In 1972 petitioner's adjusted gross income was $55,311.96 of which $47,796.16 or 86.41 percent was interest income. Petitioner reported a loss of $1,315.50 on his brokerage business and net profits of $3,207.54 from his rental property. No profit from the liquor store was reported. In 1973 petitioner had interest income totaling $34,623.70, which equaled 102.11 percent of petitioner's adjusted gross income for that year of $33,908.17. Petitioner's adjusted gross income for that year was reduced by a reported loss of $963.72 in his brokerage business, and a reported loss in his rental property of $432.32. *345 Included in petitioner's adjusted gross income was $680.51 in respect of his sales of loam for that taxable year. No amount of income or loss was reported in respect of petitioner's interest in the liquor store. OPINION This case presents the basic question of whether or not petitioner's sales of loam generated capital gain or ordinary income. Petitioner owned a tract of land overburdened with loam deposits. These deposits needed to be removed and the land graded in order to qualify the land under local law for development. Petitioner was approached by Ashley who wished to purchase this land for development. Petitioner's original asking price was $1,200,000 but the parties settled on a selling price of $1,066,000. In addition, the parties agreed that Ashley would deposit such overburden as it decided to remove from the parcel upon petitioner's adjacent land. Petitioner intended to sell to loam in the hope of generating the $134,000 difference between his asking and selling prices. As soon as the loam was deposited on his land petitioner set about trying to sell it. It was petitioner's intent to sell the loam as rapidly as possible with as little problem as possible. He, *346 therefore, sold the loam unsifted but at 41.67 percent to 50 percent of the going market rate during the years in issue for sifted and cleaned loam. Petitioner's efforts to rid himself of the loam lasted at least the ten years between the sale date in 1968 and the September 1978 trial date herein. In his original brief herein petitioner framed the issue before us as whether or not he had retained an "economic interest" in the loam. He argued that if he was found to have retained an economic interest, then the sale proceeds would be ordinary income while, if he had retained no such economic interest, then the sale proceeds should be treated as capital gains. Petitioner then went on to argue that he did not retain an economic interest in the loam and, therefore, his loam sales generated capital gain. Thus, petitioner apparently proceeds under the theory that, if we should find that he retained no economic interest in the loam he sold, we must also find that the loam was a capital asset disposed of in a series of discrete unconnected sales. Associated with petitioner's economic interest argument is his claim that the deposit of the loam on his land was in the nature of a partial *347 payment in kind by the buyer for the land from which the loam was removed. Respondent does not concern himself with whether or not petitioner retained an economic interest in the loam. He concedes that petitioner sold and did not retain an economic interest in the loam during the years is issue. Respondent's case centers around the character of the items sold, i.e. whether or not the loam sold was a capital or ordinary asset. The answer to this question, argues respondent, depends upon whether or not the loam was "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Section 1221(1), I.R.C. 1954. We consider petitioner's argument first. The economic interest concept was originated by the Supreme Court in the case of Palmer v. Bender,287 U.S. 551 (1933). In that case the court was presented with a situation in which the taxpayer was a member of two partnerships which had leased unproved Louisiana oil lands and engaged in drilling operations thereon. Oil was subsequently discovered on the leases. As a result the two partnerships each executed writings in which they conferred *348 upon two oil companies rights to occupy and extract oil from the various leased premises. In return, the oil companies took the oil lands subject to the obligations of the convenants in the various leases, and agreed to pay the partnerships a cash bonus, a cash royalty, and a royalty in kind of oil. During the taxable years there in issue petitioner Palmer reported his distributive share of the income derived by his two partnerships from the oil lands under their agreements with the oil companies. He also claimed depletion allowances on the value of the oil in place in the two properties on the various dates of discovery. The court had to decide whether Palmer's claim for a depletion allowance was proper. In finding for the taxpayer the court held that it did not matter what technical legal relationship the taxpayer had retained with the oil land, i.e. whether his partnerships had subleased the land to the oil companies or whether they had sold their leases. Rather, the taxpayer would be entitled to a depletion deduction if he had retained, by whatever means, an economic interest in the oil which would be depleted by production. Since the petitioner before them had, through *349 his partnerships, retained a right to share in the oil produced from the land, he, as a partner, was entitled to deplete this interest. The economic interest cases are directed, therefore, at determining whether or not a taxpayer who disposes of land bearing a natural resource has retained such an interest in the mineral being produced that he should be entitled to deplete this interest in order to recover his investment therein. The same concept may also be used as a tool to help determine whether or not a particular disposition of a mineral deposit is a sale--if the taxpayer has retained an economic interest, then he could not have sold the minerals and his receipts will be in the nature of royalty payments taxable as ordinary income. If he has sold the minerals, then he will be entitled to a capital gain treatment if he can show that what was sold was a capital asset. See Wood v. United States,377 F.2d 300, 305 (5th Cir. 1967). The taxpayer will be found to have sold his interest in mineral bearing deposits if he has worked a "complete and total alienation of the *350 entire interest." Hartman Tobacco Company v. United States,471 F.2d 1327, 1328 (2nd Cir. 1973). In determining whether the taxpayer has an economic interest in certain mineral deposits in place, the courts still apply the twofold test of Palmer v. Bender,supra: has the taxpayer "acquired, by investment, any interest in the * * * [mineral] in place, and * * * [received], by any form of legal relationship, income derived from the extraction of the * * * [mineral], to which he must look for a return of his capital." Palmer v. Bender,supra at 557. These considerations are substantially repeated in the regulations with respect to depletion. See section 1.611-1(b)(1), Income Tax Regs. It was of key importance in Palmer that the taxpayer there had retained an interest in the mineral itself. This consideration was voiced 34 years later in the case of Wood v. United States,supra at 306, when the court said "the critical consideration is whether payment is dependent upon extraction *351 * * *." With this understanding of the economic interest concept in mind, we fail to see its relevance to the main question in this case, i.e., whether or not petitioner should be allowed capital gain treatment on the sale of his loam. The most petitioner can hope to gain from a successful application of the rule is our agreement that he "sold" loam--as opposed to disposing of it in some other manner. But respondent has not argued that the loam was not "sold". In fact his case rests upon the conclusion that it was sold--but in the ordinary course of a business. Thus, the issue in this part of the case is not the nature of the transactions by which petitioner disposed of his loam, which we think were clearly sales, but the nature of the item sold. The relevant code section is 1221(1). [2] The purpose of this provision is to distinguish between profits and losses arising from the every day operation of a business and the realization of the appreciation in value which occurs over a substantial period of time. Malat v. Riddell,383 U.S. 569, 572 (1966). Whether income *352 arises in a trade or business or from a series of separate transactions is a question of fact. Howell v. Commissioner,57 T.C. 546, 556 (1972). In answering this question the cases have developed certain tests: These tests include: (1) The purpose for which the asset was acquired; (2) the frequency, continuity, and size of the sales; (3) the activities of the seller in the improvement and disposition of the property; (4) the extent of improvements made to the property; (5) the proximity of sale to purchase; and (6) the purpose for which the property was held during the *353 taxable years. Robert W. Pointer,48 T.C. 906 (1967), affd. 419 F.2d 213 (C.A. 9, 1969); James G. Hoover,32 T.C. 618 (1959). [Howell v. Commissioner,supra at 554.] We think it clear that the income here at issue arose from the sale by petitioner of property held by him primarily for sale to customers in the ordinary course of a trade or business. We hold, therefore, that it is ordinary income. [3]
Applying the tests mentioned above, we believe the following facts to be relevant. Petitioner testified that he at all times held his loam for immediate sale. See Gates v. Commissioner,52 T.C. 898, 905 (1969). Indeed, petitioner acquired the loam originally for the express purpose of immediately selling it, hopefully thereby realizing a profit of $134,000. Not only did petitioner at all times hold the loam for *354 sale, but he embarked upon a course of dealing designed to create a market for his loam. He undercut the local market price for treated loam by at least 50 percent. He could do this because he had no costs associated with the sale of loam, i.e. he neither sifted, cleaned nor delivered his loam. Petitioner advertised in several newspapers on a regular basis. He put up road signs. He engaged in negotiations with various customers on the volume and price of their purchases. He solicited the sale of loam to large users in the hope that they would at some time buy his whole remaining supply of loam. This course of activity clearly reveals to us such "progression, continuity and sustained * * * activity * * *" as to put petitioner's efforts in the category of a "business." Boomhower v. United States,74 F.Supp 997, 1002 (N.D. Iowa 1947). See Adam v. Commissioner,60 T.C. 996, 1000, 1001 (1973), Snell v. Commissioner,97 F.2d 891, 892 (5th Cir. 1938), affg. a Memorandum Opinion of this Court. This business was not just a temporary occupation. It was one of petitioner's continuous activities over the course of the last 10 years *355 and was one of petitioner's only money making activities during those years. See Hoover v. Commissioner,32 T.C. 618, 627 (1959), Adam v. Commissioner,supra.Petitioner allocated substantial amounts of his time to this business. Assuming that petitioner sold all his loam at a price of $1.50 per square yard, petitioner sold 4, 751.4, 7,695.51 and 1,098.67 square yards during 1971, 1972, and 1973, respectively. At 500 square yards per customer, this involved an average of 9 customers per year during each year before us. From all these facts we conclude that the loam in issue was property held by petitioner "primarily" for sale to customers in the ordinary course of his business of selling loam. We think it clear that petitioner's profits from the sale of loam arose from the operation of a business and not from the gradual appreciation over time of a capital asset. This is so even if we were to accept, as we have not, petitioner's argument that the loam was received by him in part payment for the land he sold. [4] Were we to accept this contention then it would follow that petitioner's tax effective possession of the loam began when it was *356 delivered to him by Ashley. When petitioner sold the loam he was, therefore, merely realizing the value which had been delivered to him by a third party--not value which had accrued over a course of time. His purpose in holding the loam was not the same as his purpose had been in holding the land. Having found that petitioner's sale generated ordinary income, we must next determine whether or not he is entitled to an allowance for depletion during the years before us. Firstly we note that having determined that petitioner was in the business of selling loam, it follows that petitioner is restricted to the "normal" rules of basis recovery and has no need to resort to the depletion method. But even if this consideration is put aside, petitioner is still not entitled to an allowance for depletion. Loam is not subject *357 to percentage depletion. Section 613(b)(7)(A). Petitioner is thus limited to claiming cost depletion. Sections 611 and 612. The question of whether petitioner is entitled to cost depletion in the sale of his loam rests on (1) whether he had an economic interest in the loam, and (2) whether he had any basis therein. The regulation in the economic interest area reflects the law as stated in Palmer v. Bender,supra.See also Commissioner v. Southwest Expl. Co.,350 U.S. 308, 317 (1956). Sec. 1.611-1(b)(1) * * * An economic interest is still possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place * * *, and secures, by any form of legal relationship, income derived from the extraction of the mineral * * *, to which he must look for a return of his capital. Petitioner did not acquire by investment any interest in mineral in place. Petitioner received the loam severed from land he sold as an accommodation to *358 him and a convenience to the purchaser. Ashley purchased the land for $1,066,000 and this sum only was its consideration for the land. It was under no obligation to deliver any loam to petitioner if it decided it needed the loam. Ashley did not warrant that petitioner would make any money off the loam. Thus we hold that petitioner had not retained an economic interest in the loam. These considerations also help dispose of the basis question. The basis upon which cost depletion is allowed is the property's adjusted basis as provided in section 1011. Section 612. Petitioner has failed to show that his loam had any basis in his hands. He sold the land from which the loam was taken for $1,066,000. His cost basis therein had been approximately $10,000. We do not understand petitioner to argue that he should be allowed to allocate part of his original cost basis in the land to his loam. But even if he had so argued, we note that petitioner allocated zero basis to those square yards of loam he sold during the years in issue. We conclude, therefore, that petitioner allocated his entire basis *359 in the land to the sale transaction and that he allocated a zero basis to the loam. Again even if we were to accept petitioner's argument that his receipt of the loam was somehow in partial consideration for his sale of the land, petitioner has failed to demonstrate what value the loam had as of the sale date. Nor has he argued the applicability of principles analogous to those described in Philadelphia Park Amusement Co. v. United State, 126 F.Supp. 184, 189, 130 Ct. Cl. 166, 172 (1954), or United States v. Davis,370 U.S. 65, 72 (1962). Since petitioner had no basis in the loam sold during the years in issue, he cannot be allowed a cost depletion deduction. Decision will be entered for Respondent. Footnotes
1. We note that while petitioner reported this excess as being $11,246.52, the correct result is $11,196.52.↩
2. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include-- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *.↩
3. We note that respondent's statutory notice claims additional income for petitioner for 1972 in the sale of loam in the amount of $5,573.26. This figure is correct although it is not 50 percent of $11,196.52 because it reflects petitioner's original over-reporting error.↩
4. Petitioner implies a second argument in his reply brief. There he says: "The whole purpose behind the sales, however, was liquidation of the petitioners' investment in the land sold to Ashley Realty Trust." This could↩ be the inference of an argument that petitioner allocated part of his land's basis to the loam. If so, then we reject it as is seen below.