Ridgewood Land Company, Inc. v. Commissioner.
Ridgewood Land Co. v. Commissioner
Docket No. 4934-69.
United States Tax Court
T.C. Memo 1972-16; 1972 Tax Ct. Memo LEXIS 240; 31 T.C.M. (CCH) 39; T.C.M. (RIA) 72016; January 19, 1972, Filed *240 Petitioner-corporation, since 1959, has been engaged in developing subdivisions for sale in smaller parcels to builders of residential property. From 1959 through the taxable year 1966 here in issue, petitioner developed and sold lots to such builders from subdivisions created out of a tract of about 500 acres in Jackson, Mississippi. At the time of the instant trial, approximately 325 acres thereof had been sold to customers and the gain reported on its returns as ordinary income. In 1962, petitioner purchased an 80.89-acre tract of raw land known as Fair Oaks Subdivision on the border of the city limits of Jackson. In September 1964, a negotiator of the Mississippi State Highway Department asked petitioner's officers to sell Fair Oaks to the State for fill dirt to be used in a current construction project. Petitioner refused to sell, and on October 12, 1965, the Highway Department authorized condemnation of Fair Oaks. While under this order of condemnation, petitioner in two transactions sold Fair Oaks on December 40 28, 1965, and February 3, 1966, to an individual who owned undeveloped acreage adjacent to Fair Oaks for a higher price than the Highway Department offered and *241 reported the gain as long-term capital gain. Held, that petitioner purchased and initially held Fair Oaks for sale to customers in the ordinary course of its business. Between September 2 and 15, 1964, when petitioner concluded that development of Fair Oaks would be futile because of the threat or imminence of condemnation, it changed its original intention and held the acreage for investment. Held further, that Fair Oaks was a capital asset at the time of sale entitled to preferential long-term capital gain treatment under sec. 1221, I.R.C. 1954. Tri-S Corp., 48 T.C. 316 (1967), affd. 400 F. 2d 862 (C.A. 10, 1968), followed. Hugh C. Montgomery, Jr., and Charles L. Brocato, 1801 Deposit Guaranty Bank Bldg., Jackson, Miss., for the petitioner. J. Leon Fetzer, for the respondent. WITHEY
*242 Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent determined a deficiency in petitioner's Federal income tax for the taxable year ended September 30, 1966, in the amount of $3,681.40. The issue presented for decision is (1) whether petitioner realized ordinary income rather than long-term capital gain as reported from the sale of acreage under the threat of condemnation by the State of Mississippi Highway Department; and (2) alternatively, if it is held that petitioner acquired the acreage in question for sale to customers in the ordinary course of its trade or business, but changed its purpose upon threat of condemnation, whether the holding period begins at such date or at the dates of acquisition in 1962, as returned. Findings of Fact Some of the facts have been stipulated and together with stipulated exhibits are so found and incorporated herein by reference. Ridgewood Land Company, Inc., hereinafter sometimes referred to as petitioner, filed its income tax return for the fiscal year ended September 30, 1966, with the district director of internal revenue, Jackson, Mississippi. At the time the petition was filed, petitioner was a Mississippi corporation *243 having its principal office in Jackson, Mississippi. Petitioner was incorporated in 1959. Its business was primarily the development of subdivisions for the construction of residences; and its customers were mainly builders. During 1959, petitioner purchased a tract of about 500 acres of undeveloped land. From 1959 through the taxable year ended September 30, 1966, here in issue, petitioner developed and sold lots to builders from two subdivisions created out of this tract. These two subdivisions, Ridgewood Park, Parts 1 through 6, and Lake Trace North, Parts 1 through 4, were located northeast of the City of Jackson. Petitioner had a general overall plan (including its own sewer system and a private water system) for the development of the entire 500 acres into residential subdivisions. Development of the area has generally followed this initial plan, and at the time of the instant proceeding, about 325 acres thereof have been so developed. During 1962, petitioner purchased lots consisting of 80.89 acres of raw land in the Fair Oaks Subdivision (hereinafter sometimes referred to as Fair Oaks) on the following dates at the following amounts: Purchase
Lots
date
Price
3lh5/14/62
$ 17,500.00
4
5/19/62
17,518.85
1, 9, 10, 11
3/31/62
69,627.17
8
6/ 5/62
17,500.00
2
6/25/62
17,486.70
Total
$139,632.72
*244 Fair Oaks Subdivision consists of the S 1/2 of N 1/2 of SW 1/4 and SE 1/4 of SW 1/4 and E 3/4 of SW 1/4 of SW 1/4, all in Section 36, Township 6, Range 1 West, Hinds County, Mississippi. Fair Oaks is basically two tracts of land divided by 30 acres not owned by petitioner and conected by a very narrow strip of land approximately 105 feet long. Fair Oaks is located about ten direct line miles from the two subdivisions owned by petitioner northeast of the City of Jackson. Fair Oaks was divided into approximately 10-acre lots before petitioner purchased it. It was first described in a warranty deed dated July 30, 1929, conveying the 41 aforesaid property and recorded in Book 227 at page 220 of the land records of Hinds County. This property was mapped for descriptive purposes, but it is not an official plat of the property and is not included in the plat book records of Hinds County, Mississippi. At the time petitioner purchased Fair Oaks, it was potential development land. This 80.89-acre tract could not be immediately developed or exploited for sale to home builders because it was not officially platted, was not zoned, it lacked utilities, and was outside the city limits *245 of Jackson. Officers of petitioner anticipated that Jackson would eventually expand its boundaries; therefore, they expected utilities to become available since Jackson would have been required to provide uiilities of the land in question was eventually included within the city limits. [1]
J. E. Sheppard, an officer of petitioner and an owner of 25 percent of petitioner's stock had in his personal capacity developed land in West Jackson. He had developed tracts as small as ten acres. He was also a stockholder in M & S Homes, Inc., a corporation which developed land just across the street from Fair Oaks, which land was within the city limits of Jackson and utilities were available therefor. In petitioner's accounting system, each piece of property purchased was recorded in and on a separate sheet of paper as a separate account in the ledger. Each such account was placed in its ledger under a tab labeled "Undeveloped Lands." As petitioner developed land, it would remove the sheet of paper or account from the "Undeveloped Lands" category (or write the cost of the portion *246 of the property developed off an account which remained under the "Undeveloped Lands" tab) and place it under a tab with the name of the development and part number. Fair Oaks was recorded in the ledger under "Undeveloped Lands" by petitioner's bookkeeper when she set up the account and made the first entry. Petitioner's accountant, who is a C.P.A. and attorney, reviewed the bookkeeper's work, including the Fair Oaks account and did not change the designation during the taxable year involved. Petitioner carried Fair Oaks at all times during the period before us under the "Undeveloped Lands" tab in the same manner and without distinction from other undeveloped lands (viz., Ridgewood Park and Lake Trace North) which petitioner was holding for development and sale to customers and which petitioner did subsequently develop. During the taxable year involved, both Ridgewood Park and Lake Trace North were residential developments held by the petitioner for sale to customers. Petitioner held the following tracts in the Ridgewood Park and Lake Trace North subdivisions for the following periods before it began development: Date
Approximate period of
physical
time held as under-
Date
improvement
veloped property
purchased
started
Years
Months
Ridgewood Park:
Part 1
11/6/59
2/ 2/60
4
Part 2
11/6/59
4/27/61
1
7
Part 3
11/6/59
6/13/62
2
9
Part 4
11/6/59
5/31/66
6
7
Part 5
11/6/59
5/31/66
6
7
Part 6
11/6/59
1968
8
Lake Trace North:
Part 1
11/9/59
11/25/63
4
Part 2
11/9/59
3/16/65
5
5
Part 3
11/9/59
1967
7
Part 4
11/9/59
9/18/68
8
10
*247 Petitioner sold the following property during the fiscal year ended September 30, 1966, and reported the gain as ordinary income: Property Sold
Number
Sale
Date of sale
Location
of lot
price
10/12/65
Ridgewood Park 3
6
$17,000
11/22/65
A residential lot sold by metes and bounds
2,400
description out of Lake Trace North 2
1/ 7/66
Ridgewood Park 3
1
2,850
1/13/66
Ridgewood Park 3
1
2,850
1/19/66
Ridgewood Park 3
1
3,500
1/28/66
A parcel 30 X 40 feet for a water well
500
3/ 1/66
Lake Trace North 1
1
Lake Trace North 2
18
71,250
3/11/66
Lake Trace North 2
19
71,250
5/27/66
Ridgewood Park 3
Lake Trace North 1
21
63,600
5/27/66
Ridgewood Park 3
21
Lake Trace North 1
1
63,600
8/30/66
A residential lot sold by metes and bounds
1,800
description out of acreage adjacent to
Ridgewood Park 3
The property in Ridgewood Park and Lake Trace North sold to Dr. Sterling McNair, Hinds County Water, and George Treadwell were under the "Undeveloped Lands" category at the time of sale. The acreage destined to be Parts 4, 5, and 6 of Ridgewood Park and Parts 4 and 5 of Lake Trace North were listed under *248 the "Undeveloped Lands" category during the taxable year involved herein. On or about August 5, 1964, a project area had been set up to provide fill dirt for Interstate Highway I-20 and I-220 in Hinds County, Mississippi. Included in the project area was a block of land which encompassed all of the 80.89 acres of land in Fair Oaks owned by petitioner. Petitioner knew nothing of this project in 1962 when the 80.89 acres were purchased. At some date between September 2, 1964, and September 15, 1964, the Mississippi State Highway Department, through Walter Martin (hereinafter called Martin), Right of Way Negotiator, contacted officers of petitioner and offered to buy the land in question for $2,500 per acre. The offer was rejected and on several occasions thereafter, Martin made the same offer to buy this property. Woodrow W. Bailey, president of petitioner, and George C. Bailey, vice-president of petitioner, each an owner of 25 percent of petitioner's stock, told Walter A. Martin at various times during 1964 and 1965 that petitioner intended to develop the land in question. During the course of these conferences with Martin in September 1964, petitioner was informed that the State *249 Highway Department could institute eminent domain proceedings to condemn Fair Oaks if petitioner refused to sell the land voluntarily. At this time petitioner, upon consultation with its attorney, realized that title to Fair Oaks was clouded by the threat of condemnation and could not be developed for eventual sale to builders of residential houses. Unsuccessful negotiations continued and on October 12, 1965, the State Highway Department declared that lots 1, 2, 3, 4, 8, 9, 10, and 11 of Fair Oaks were necessary for public use as a source of highway materials (fill dirt). On that same day, the State Highway Department informed petitioner that if petitioner did not sell the property to the State Highway Department for $2,500 per acre, eminent domain proceedings would be instituted. As of October 12, 1965, the State Highway Department had already purchased the 30 acres in lots 5, 6, and 7 of Fair Oaks (the property owned by other parties which separated the two parts of the 80.89 acres owned by petitioner). Lot 5 and the north one-half of lot 6 of the Fair Oaks Subdivision (containing 15.17 acres) were purchased by the Highway Department from W. T. Bridges, Sr., on October 12, 1965, for *250 $37,925. Lot 7 and the south onehalf of lot 6 of Fair Oaks Subdivision (containing 15.17 acres) were purchased by the department from others for $37,925. These purchases by the State Highway Department were known to petitioner before its own 80.89 acres were sold. W. G. Cook, Jr. owned land adjacent to petitioner's 80.89-acre tract and had also been negotiating with the State Highway Department about the sale of borrow (or fill) material from his land for Interstate 220. Cook was in the heavy and highway construction business and had never been in the real estate or the land development business. Cook knew of the potential eminent domain proceeding action with respect to petitioner's land. Nevertheless, Cook contacted petitioner and offered to 43 purchase Fair Oaks allegedly "to protect his adjacent property" by squaring off his own boundaries and putting together enough land so that he could sell the required borrow material to the State Highway Department and at the same time be "in the driver's seat" to negotiate the sale and obtain a larger price than had been offered to petitioner. Petitioner had no desire to sell the property and declined several offers from Cook. After *251 the Highway Department authorized on October 12, 1965, the condemnation of this property, and while under this threat of condemnation, petitioner agreed to sell the property to Cook. Thereafter about 10 acres were sold to Cook on December 28, 1965, for $25,000, and the remaining 70.89 acres were sold to him on February 3, 1966, for $210,000. Petitioner had never sold any undeveloped acreage in a bulk quantity other than the 80.89 acres in Fair Oaks. The tract was never advertised for sale and it was never listed with any broker or realtor. Petitioner did not solicit the offers from Cook. Petitioner realized a total net profit of $95,099.28 which was reported on the installemnt basis, with $16,118 being reported as long-term capital gain income for the year ended September 30, 1966. On May 28, 1968, Quentin Stringer, former chief of the Mississippi State Highway Right of Way Division wrote to A. T. Papa, Appellate Conferee of the Internal Revenue Service, outlining circumstances relative to the Highway Department's negotiations with petitioner, which circumstances are stipulated to be the facts. This letter reads, in pertinent part, as follows: The officers of Ridgewood Land *252 Company, Inc., have asked that I write you and verify the fact that a threat of seizure of the above land through eminent domain proceedings had been made to them prior to their sale of this land to W. G. Cook. On or about August 5, 1964, a project area had been set up to provide fill dirt for Interstate Highway I-20 and I-220, Projects No. I-IG-20-1 (13)41 and I-IG-220-3(2)41. Included in the project area was a block of land which encompassed the above referred to lots in Fair Oaks Subdivision owned by Ridgewood Land Company. On September 2, 1964, the Mississippi State Highway Department issued instructions to its Right of Way Division to begin contacting the owners of land in this area and make an effort to buy this property. Mr. Walter Martin, Right of Way Negotiator, made contact with Messrs. George Bailey and J. E. Sheppard and other officers of Ridgewood Land Company at some date prior to September 15, 1964. Mr. Martin made numerous offers to buy this property on several occasions. However, the officers of Ridgewood Land Company did not want to sell this land and turned down our highest offer, which was $2,500.00 per acre. Finally the negotiations reached the stage where *253 it was clear that the ownery and Mr. Martin told them that if of this property was not going to sell voluntaril they would not sell the property to the State Highway Department for $2,500.00 per acre, eminent domain proceedings would be instituted. This statement was made to George Bailey and J. E. Sheppard and possibly other officers of the company. Mr. Bailey questioned the authority of the state to take the land for this purpose through eminent domain. Mr. Martin referred him to the appropriate section of the statute. The exact date of the statement that eminent domain proceedings would be instituted was October 12, 1965. I am enclosing herewith certified copy of minutes directing the Chief Engineer to prepare evidence for the condemnation proceedings authorized and ordered. George Bailey and J. E. Sheppard later had a conference in this office with Mr. W. R. Farlow, Coordinator of Legal Affairs, Mr. Martin and Mr. W. A. Tillman, Chief Draftsman, in an effort to persuade the Highway Department that the property was worth mare than $2,500.00. This meeting was held on January 4, 1966. At this conference Mr. Farlow confirmed that the Highway Department would institute eminent domain *254 proceedings to secure this property. At the time Mr. Martin informed the officials of Ridgewood Land Company, Inc., that if they did not sell the property at the offered price the eminent domain proceedings would be instituted, the Highway Department had already purchased a substantial amount of land in this project area which was around the subject Fair Oaks Subdivision property. Ultimate Findings of Fact Petitioner purchased and initially held Fair Oaks with the intention of developing it and selling it in smaller parcels to customers for residential purposes in the ordinary course of its business. On or shortly after September 2, 1964, when petitioner realized that the State Highway Department would institute eminent domain 44 proceedings, if necessary, to acquire the property in question, petitioner changed its original intention and held the land for investment purposes. The property sold to W. G. Cook, Jr., was a capital asset and at the time of sale had been held by petitioner as such longer than six months. Opinion Respondent determined that gains realized from the sale of Fair Oaks, an 80.89-acre tract of unimproved land during the taxable year ended September 30, 1966, are *255 taxable as ordinary income from the sale of property held primarily for sale to customers in the ordinary course of petitioner's trade or business. Essentially, it is respondent.s position that the land in question was not a capital asset within the meaning of section 1221 of the 1954 Code, [2] but was purchased by petitioner and carried in its "inventory" of raw land for eventual development and sale to customers, and in spite of the threat of condemnation during 1965, of the threat of condemnation during 1965, was never held for investment purposes. Petitioner, in opposition, contends that Fair Oaks was acquired and held continuously for investment, was a capital asset, and that the gain upon sales in 1965 and 1966 is taxable as long-term capital gain. [3] Alternatively, petitioner avers that if it should be determined that the tract in question was acquired for sale to customers in the ordinary course of its business, then its primary objective changed during 1964 and the land was then held primarily for investment at the time of sale to W. G. Cook, Jr. *256 Subchapter P, sections 1201, et seq., I.R.C. 1954, provides for special treatment of gains received on the sale of capital assets. Section 1221(1) excludes from the definition of a capital asset "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." In Malat v. Riddell, 383 U.S. 569, 572 (1966), the Supreme Court concluded with respect to this statutory provision: The purpose of the statutory provision with which we deal is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand * * * and "the realization of appreciation in value accrued over a substantial period of time" on the other. * * * A literal reading of the statute is consistent with this legislative purpose. We hold that, as used in § 1221(1), "primarily" means "of first importance" or "principally." As the capital gains provision represents "an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly" in order "to effectuate the basic congressional purpose." Corn Products Co. v. Commissioner, 350 U.S. 46, 52 (1955); *257 Commissioner v. P.G. Lake, Inc., 356 U.S. 260, 265 (1958). It is well established that a taxpayer in the real estate business may hold real estate as an investment, Randolph D. Rouse, 39 T.C. 70 (1962); Eline Realty Co., 35 T.C. 1 (1960); Charles E. Mieg, 32 T.C. 1314 (1959); Nelson A. Farry, 13 T.C. 8 (1949). However, there is no fixed formula or rule of thumb for determining whether particular property sold by the taxpayer was held by him primarily for sale to customers or as an investment. The issue is essentially a question of fact and necessarily each case turns upon its own precise facts and no one circumstance or factor is controlling. Commissioner v. Pontchartrain Park Homes, Inc., 349 F. 2d 416 (C.A. 5, 1965), affirming a Memorandum Opinion of this, Court; Bauschard v. Commissioner, 279 F. 2d 115, 118 (C.A. 6, 1960), affirming 31 T.C. 910 (1959); Friend v. Commissioner, 198 F. 2d 285, 287 (C.A. 10, 1952); Rubino v. Commissioner, 186 F. 2d 304 (C.A. 9, 1951), certiorari denied 342 U.S. 814 (1951). Respondent's determination is presumptively *258 correct and petitioner has the burden to show error therein. Several factors have been enumerated by the courts for the resolution of the issue under review, some of which are: (1) The 45 purpose for which the property was initially acquired; (2) the purpose for which the property was held at the time of sale; (3) the activities of the seller, or those acting either with him or on his behalf, with respect to the improvements and actual disposition of the land; (4) the frequency, number, and continuity of sales; (5) the extent and substantiality of the transactions involved; (6) the ordinary business of the taxpayer; (7) the extent of advertising, promotion, or other active efforts employed in soliciting buyers for the sale of the property and (8) the listing of property with brokers. See James G. Hoover, 32 T.C. 618 (1959); D.L. Phillips, 24 T.C. 435, 445 (1955). None of these factors are conclusive standing alone, but rather all of the applicable factors taken as a whole govern. Gomble v. Commissioner, 242 F. 2d 586, 590 (C.A. 5, 1957); W. T. Thrift, Sr., 15 T.C. 366 (1950). After a careful consideration of the entire record *259 and bearing the foregoing factors in mind, we have concluded that petitioner has failed to meet the burden of proving that it initially acquired and held Fair Oaks for investment purposes, and that on the contrary, the record supports the view that its primary interest - prior to the threat of condemnation by the State Highway Department - was in holding the land in question for eventual development and sale in the ordinary course of its business. Although the facts are set forth in our Findings in detail, we think the following should be noted here: Fair Oaks, 80.89 acres of raw land, was carried in petitioner's inventory from the date of its purchase in 1962 to the time of its sale to W. G. Cook, Jr., some 3 1/2 years later. Significantly, petitioner recorded Fair Oaks in an account under the heading "Undeveloped Lands" as it did all other land which it was holding for exploitation and which it later developed and sold. Likewise, we note that the minutes of petitioner's stockholders' meetings do not provide any indication that the land in question was acquired and held for investment. Considering that petitioner's officers were all sophisticated in realty matters, and its ledger *260 accounts were reviewed by their accountant, we believe that if this was an acquisition of raw land outside the normal course of its business, its books would have so indicated. In essence, it is petitioner's position that Fair Oaks could not be developed when purchased or at any time during the period held because, among other problems, it lacked sewage, utilities, a convenient thoroughfare to Jackson, and had other physical impediments to successful development. In the same vein, petitioner urges that it planned to hold the raw land for from 5 to 15 years and then decide what should be done with it. We believe that Fair Oaks when acquired was suitable for development within a reasonable period of time. Although Fair Oaks when purchased in 1962 had no access to utilities, the city limits ran along its eastern boundary on Dixon Drive and petitioner expected Jackson to expand and provide access to utilities. Moreover, we attach no significance to the fact that Fair Oaks was odd shaped. Each half of the tract was well over 30 acres and petitioner's president testified that he had developed tracts as small as 10 acres. Nor do we find any merit to petitioner's argument that Fair Oaks *261 is located in the westerly portion of Jackson, whereas the 500-acre tract (Ridgewood Park and Lake Trace North) which petitioner was developing for sale to customers is situated about ten direct miles away in the northerly portion of the City. It is noteworthy that J. E. Sheppard testified that he participated in the development of Dixon Acres just across the street from Fair Oaks, and it is apparent that the access of Fair Oaks to downtown Jackson was no worse than Dixon Acres or any other undeveloped area which petitioner might purchase for potential development. Ordinarily, purchasing and holding raw acreage is an integral part of the subdivision development business, and in the absence of special circumstances, such acreage is not a capital asset. That petitioner held the land in question undeveloped for about three years in no way demonstrates that petitioner did not intend to keep it in its inventory of raw land for eventual development. Indeed, petitioner held other tracts of land as long as eight years before it began to develop them. Petitioner's practice in its Ridgewood Park and Lake Trace North subdivisions indicates that land which it intended to develop was often purchased *262 many years prior to actual development. Land which is held by a developer principally for development and sale, even when undeveloped for an extended period of time, is "property held primarily for sale to customers in the ordinary course of his trade or business" within the ambit of section 1221, supra. Estate of Freeland v. Commissioner, 393 F. 2d 57346 (C.A. 9, 1968), affirming a Memorandum Opinion of this Court. As we view it, the purchase of Fair Oaks was unalterably tied in with and related to petitioner's business of developing raw land. The land in question cannot reasonably be considered an "investment" at the time of purchase by petitioner. The latter's contention that the purchase of Fair Oaks was separate from its real estate business is not supported by the facts of record. Petitioner's motive in buying Fair Oaks appears to have been not that of a capital investor but that of a far-sighted developer who seeks to replenish his inventory of raw land. See Mansfield Journal Co. v. Commissioner, 274 F. 2d 284 (C.A. 6, 1960), affirming 31 T.C. 902 (1959). However, the fact that petitioner acquired this land for such purpose does *263 not, ipso factot prevent petitioner from prevailing on the alternative issue of fact raised herein. It has often been held that though the underlying purpose of the acquisition is to be given consideration, that purpose is necessarily subject to change. Cf. Carl Marks & Co., 12 T.C. 1196, 1202 (1949); E. Everett Van Tuyl, 12 T.C. 900 (1949). Where such has been the case, the original purpose gives way to the purpose for which the particular property is held at the time of its sale. As stated in Mauldin v. Commissioner, 195 F. 2d 714, 717 (C.A. 10, 1952), affirming 16 T.C. 698 (1951), "While the purpose for which the property was acquired is of some weight, the ultimate question is the purpose for which it was held [at the time of sale]. Rollingwood Corp. v. Commissioner, 9 Cir., 190 F. 2d 263." Eline Realty Co., supra, 5; Alice E. Cohn, 21 T.C. 90 (1953), affd. 226 F. 2d 22 (C.A. 9, 1955); Herzog Building Corp., 44 T.C. 694, 704 (1965). After petitioner received what it considered to be a threat of condemnation in September 1964, its officers realized that it *264 would be futile to hold the land any longer for eventual residential development; their original objective in holding Fair Oaks had to be abandoned and thereafter the land was held primarily for speculation and investment. See Eline Realty Co., supra, 6-7. By the time of the disposition of the land in question in the latter part of 1965 and 1966, petitioner's purpose with regard to Fair Oaks had been so altered by circumstances beyond its control that the character of the land could no longer be considered within section 1221(1), supra. See Commissioner v. Pontchartrain Park Homes, Inc., supra.After September 1964 (when Martin discussed the possibility of condemnation with petitioner), Fair Oaks was no longer held "for sale to customers in the ordinary course of * * * business." In our opinion the sale to W. G. Cook, Jr., in 1965 and 1966 was not a sale in the routine course of petitioner's business. The sale to Cook was in effect an involuntary sale and undoubtedly would not have been made were it not for the threat of condemnation by the State Highway Department. Petitioner's business was the development of raw land for sale in smaller parcels to builders. *265 The sale to Cook was the only transaction in which petitioner purchased a large tract of undeveloped land, held it for a period of time, and then sold it in bulk to an individual who was not engaged in building or in the land development business. Under the circumstances, we do not believe that the profit realized by petitioner on this one isolated transaction represents "profits * * * arising from the everyday operation of a business." Rather we think the profit stemmed from a change in the character of the property because of the real threat of condemnation and represented "the realization of appreciation in value accrued over a substantial period of time" while the petitioner held Fair Oaks. Malat v. Riddell, supra, 572. Our conclusion is in accord with what we stated in Raymond Bauschard, 31 T.C. 910 (1959), to be the fundamental objective of the capital gain provisions, i.e., to grant preferential treatment to the gains realized from those transactions which are not the normal source of the taxpayer's business income. Maddux Construction Co., 54 T.C. 1278 (1970). We reject respondent's contention that there were no utterances or threats of condemnation *266 against Fair Oaks by the State Highway Department prior to October 12, 1965. Respondent argues that during all of the conferences between the department and petitioner, including the discussions relating to the legal right of the State to condemn Fair Oaks, the State was merely attempting to "negotiate" a source of fill dirt. Analysis of the record leads us to conclude that shortly after the initial attempt by the State to purchase the land in question sometime between September 2 and 15, 47 1964, it expressed a threat to petitioner's officers that the State, by the exercise of eminent domain proceedings, could and would take Fair Oaks if the State's offer to purchase it was turned down. Petitioner confirmed its apprehension of potential seizure by the State after consulting its attorney in the matter. Accordingly, we are persuaded that the holding period of Fair Oaks as a capital asset goes back to September 1964. Thereafter it sought to realize the maximum possible consideration from a sale to the State Highway Department or anyone else who wanted to purchase the acreage. Unsuccessful negotiations went on with the Highway Department over a period greater than a year beginning *267 in September 1964 until October 12, 1965. [4]
At this time, W. G. Cook, Jr., the owner of the acreage adjacent to Fair Oaks was also engaged in negotiations with the State Highway Department with respect to fill dirt from his tract. Cook contacted petitioner and offered to buy Fair Oaks allegedly (1) to square off his own boundaries and to serve as a buffer for his land and (2) to place himself in a better position for negotiating a sale to the Highway Department. After some bargaining, Cook bought Fair Oaks in two transactions on December 28, 1965, and February 3, 1966, for more than the State had offered. The fact that petitioner sold Fair Oaks under these circumstances does not alter our conclusion that the land in question was no longer held for development and sale in the ordinary course of petitioner's business and gain on the *268 sale is to be given long-term capital gain treatment. In Tri-S Corp., 48 T.C. 316 (1967), affd. 400 F. 2d 862 (C.A. 10, 1968), the Court concluded that prior to the receipt of a condemnation notice from the Colorado State Highway Department, the property there in question was held by the taxpayer therein primarily for sale to customers in the ordinary course of business, but that after the receipt of the condemnation notice, the property ceased to be so held and was a capital asset at the time of its sale to the Highway Department. We regard the rationale and holding in Tri-S Corp. to be determinative of the instant case. In light of the foregoing and the record as a whole, we sustain petitioner on this issue. Because of other adjustments in the notice of deficiency which are not before us, Decision will be entered under Rule 50. Footnotes
1. At the time of the instant proceeding, Fair Oaks had not been developed for the construction of houses.↩
2. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; ↩
3. The decision herein will affect tax liability for future years because the sale transaction in dispute has been reported under the installment method of accounting.↩
4. On October 12, 1965, the State Highway Department had purchased lot 5 and one-half of lot 6, and lot 7 and the other half of lot 6 on September 24, 1965 (the 30 acres of property owned by other parties which separated the two parts of the 80.89 acres owned by the petitioner). The petitioner learned of the purchase "just before the Cook sale."↩